[Cite as *In re C.S.*, 2019-Ohio-5109.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
PIKE COUNTY

| | | |
|---|---|---|
| IN THE MATTER OF: | : | Case No. 19CA899 |
| C.S. | : | |
| H.S. | : | |
| ADJUDICATED ABUSED, NEGLECTED | | DECISION AND |
| AND DEPENDENT CHILDREN. | : | JUDGMENT ENTRY |

**RELEASED 11/20/2019**

APPEARANCES:

Matthew F. Loesch, Portsmouth, Ohio for appellant.

Elisabeth M. Howard, Waverly, Ohio, for appellee.

Hess, J.

**{¶1}** After the Pike County Juvenile Court granted permanent custody of her two children to the Pike County Children's Services Board ("agency"), the mother appealed.[1] The mother's sole assignment of error is that the trial court's determination that permanent custody was in the best interest of the children was against the manifest weight of the evidence. However, after weighing the evidence and all reasonable inferences, considering the credibility of the witnesses after according the requisite deference to the trial court's determinations, we conclude that in resolving evidentiary conflicts, the trial court did not clearly lose its way or create a manifest miscarriage of justice so that we must reverse its judgment awarding permanent custody of the children to the agency. We overrule the mother's sole assignment of error and affirm the judgment of the trial court.

---

[1] The father never appeared for any hearings, was not part of the case plan for reunification, and had no contact with the minor children during the pendency of the case.

## I. PROCEDURAL HISTORY AND FACTS

**{¶2}** The agency became involved following a domestic violence incident involving the mother and her abusive boyfriend, Joshua Barnett. The agency filed a dependency action and was awarded temporary custody of C.S. and H.S. in September 2017. In October 2017, the trial court adjudicated the children abused, neglected and dependent. From September 2017 through February 2018, the mother had two hours per week of supervised parenting time. In February 2018, the mother's parenting time increased to eight hours per week of unsupervised parenting time on Saturdays in her home, as long as the mother's abusive boyfriend, Barnett, was not living there. However, in late March the agency suspected that Barnett was living with the mother after observing bruises on the mother, learning of statements the children made at school about Barnett's presence in the home, and observing Barnett's personal belongings in the home. The agency sought to terminate unsupervised parenting time. However, the trial court declined to do so and instead ordered Barnett's things to be removed from the mother's home, reduced the unsupervised parenting time from eight to five hours, and moved it to Thursdays to allow the agency to perform random checks during parenting time.

**{¶3}** In August 2018, the trial court expanded the mother's parenting time to every weekend from Friday afternoon to Sunday evening and prohibited Barnett from being in the mother's home at any time. When the mother came to pick up the children for the first weekend visit in August 2018, she tested positive for methamphetamines and amphetamines. The trial court terminated all unsupervised visitation and returned her to two hours per week supervised visits. In September 2018, the mother stopped visiting the

children and the agency could not locate her. The mother's whereabouts were unknown and she had no contact with the children from September 2018 until January 2019.

{¶4}    The agency filed a request for permanent custody in December 2018 and a hearing on the matter was held June 27, 2019.

{¶5}    Agency caseworker Christine Myers testified that C.S. and H.S. had been in the continuous custody of the agency since September 20, 2017. The agency became involved in September 2017 because of a prolonged, two-day domestic violence incident involving the mother's boyfriend, Barnett. The mother and Barnett had an ongoing relationship that dated back several years. Immediately after the two-day domestic violence incident, the mother moved into a domestic violence shelter but was soon evicted because she had prohibited contact with Barnett. The mother then moved to a homeless shelter for a little over a month and then moved into an apartment with a man she met at the homeless shelter. However, this man assaulted her, choking her and knocking out a dental implant in mid-December, 2017.

{¶6}    In January 2018, the mother moved back into the home she had previously shared with Barnett and the agency suspected that Barnett was around or had access to the mother while she resided there.  Though she made some progress during the first year of her case plan, the mother relapsed in August 2018, reconnected with Barnett, tested positive for methamphetamines, and stopped visiting the children. The mother's whereabouts were unknown and she had no contact with the children from September 21, 2018 until January 7, 2019  -- a period of 108 days.

{¶7}    Myers testified that the mother entered inpatient psychological and substance abuse treatment at Safe Haven in Chillicothe, Ohio on January 4, 2019 and

was still residing at Safe Haven, engaged in substance abuse counseling at the time of the hearing. The mother did not have independent housing at the time of the hearing. The mother was never able to secure independent, stable housing throughout the pendency of the case and had previously lived either in domestic violence shelters, homeless shelters, or with violent boyfriends.

{¶8}   Myers testified that in January 2019, the mother admitted that Barnett had been present in the home during 2018, but the mother stated that Barnett was not present during the children's visits. Thus, almost the entire year of 2018, the mother had maintained her relationship with Barnett and lied to Myers and the trial court about it. Myers testified that the mother had contact again with Barnett in March 2019 while residing at Safe Haven.

{¶9}   Myers testified that at the time of the hearing C.S. was eight and H.S. was seven. Both children were emotionally and educationally impacted by their exposure to domestic violence, but were in counseling and had made significant progress.

{¶10}   Julie Lundy, a caseworker with the agency, testified that she was involved with the mother in a different case in 2007 in Jackson County, during which time the mother received domestic violence services and counseling following the removal of several of her other children from her custody.

{¶11} Julie Johnson, the mother's substance abuse counselor at Safe Haven, testified that she was providing the mother substance abuse and domestic violence counseling while the mother resided at Safe Haven. Johnson believed the mother had made progress at Safe Haven in the last few months. However, Johnson conceded that

the mother's treatment plan target completion date was not until October 2019 and, as of the time of the hearing, the mother was not ready to obtain housing.

{¶12} Kelly Padgett testified that she is the stepmother of one of the mother's other children and has had close contact with the mother over the past several years. Padgett said that C.S. and H.S. miss their other siblings and family members. Padgett stated that she would be a suitable family for custody placement for C.S. and H.S. if the trial court terminated the mother's custody.

{¶13} The children's maternal grandmother, Maria M., testified that she believed her daughter had broken through the domestic abuse cycle, had significantly changed during her time at Safe Haven, and should be given custody of C.S. and H.S. However, Maria M. also admitted that in January 2019, she and her daughter had smoked marijuana together during one of her daughter's day passes from Safe Haven. Maria M. also conceded that she is not fully knowledgeable about her daughter's relationships with men and was not aware that her daughter's current boyfriend was on probation for a felony burglary conviction. Maria M. testified that while her daughter's whereabouts were unknown from September 2018 to January 2019, her daughter made no attempts to reach out to Maria M. or her children.

{¶14} The mother testified about Barnett and the domestic violence she had experienced. Barnett had felony warrants and was incarcerated at the time of the hearing. The mother said that she had two failed suicide attempts during the time she was missing and with Barnett. The mother testified about the progress she had made through substance abuse and mental health counseling. She stated that she had been unemployed during 2017 and 2018, but at the time of the hearing, she had been employed

part-time at a local ice-cream shop for approximately one month. Prior to that job, she worked at a pizza restaurant but quit after about a month.

{¶15} On cross-examination, the mother admitted to having a long history of violent relationships. Four different boyfriends, including Barnett, had inflicted domestic violence which occurred in her home during the period she had custody of all seven of her children. The mother admitted that she had reinitiated her relationship with Barnett in July 2018 and fled with him when he failed to report to jail to serve his sentence for his domestic violence conviction involving her. However, she contended that she was being held against her will in the woods during the months she was missing. At the time of the permanent custody hearing, Barnett was incarcerated and the mother was involved with a fifth boyfriend who had a felony domestic violence conviction.

{¶16} The guardian ad litem submitted a report and recommended that the agency be granted permanent custody of both children.

{¶17} The trial court entered judgment granting permanent custody of the two children to the agency and terminating parental rights. The trial court found by clear and convincing evidence that it was in the best interest of the children to grant the agency's motion for permanent custody. The trial court found that C.S. and H.S. had been in the agency's temporary custody for 12 or more of a 22-month period. The mother has seven minor children and, at the time of the permanent custody hearing, did not have custody of any of her children. The mother admitted that she has had open children services cases in Jackson, Franklin, and Pike counties since 2007. The trial court found that both parents

had statutorily abandoned the children as defined in R.C. 2151.011(C)[2] because the mother has not seen the children since September 21, 2018 and the father has not had any contact with the children throughout the pendency of the case. The children have expressed a desire to see their mother, but the guardian ad litem recommended a termination of parental rights.

{¶18} The trial court found that the mother does not have suitable housing, does not have the means to sustain housing, and continues to be involved in relationships with violent men that have resulted in serious harm to her and have exposed her children to multiple acts of domestic violence. The mother's actions through the case show "an unwillingness to change her behaviors in order to provide an adequate permanent home for the minor children." Though the mother has made progress addressing her substance abuse issues, the trial court found that her "continuous short[-]term relationships with violent abusers" was more concerning, as was her current relationship with a man who has a felony for domestic violence. The trial court found that the children cannot and should not be reunified with the father or mother within a reasonable time. It found that because both parents had abandoned the children, reasonable efforts by the agency to eliminate the continued removal of the children from the home and make it possible for the children to return safely home under R.C. 2151.419 were not required.

{¶19} The trial court granted the agency permanent custody of the children. The mother appealed.

---

[2] R.C. 2151.011(C) states, "For the purposes of this chapter, a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days."

## II. ASSIGNMENTS OF ERROR

**{¶20}** Mother assigns the following error for our review:

THE TRIAL COURT'S AWARD OF PERMANENT CUSTODY OF C.S. AND H.M. [SIC] TO THE PIKE COUNTY CHILDREN SERVICES WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## III. LAW AND ANALYSIS

### A. Standard of Review

**{¶21}** A reviewing court will not reverse a trial court's judgment in a permanent custody case unless it is against the manifest weight of the evidence. *See In re T.J.*, 4th Dist. Highland Nos. 15CA15 and 15CA16, 2016-Ohio-163, ¶ 25. "To determine whether a permanent custody decision is against the manifest weight of the evidence, an appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving evidentiary conflicts, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Id.* at ¶ 25, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20. In reviewing evidence under this standard, we defer to the trial court's determinations of matters of credibility, which are crucial in these cases, where demeanor and attitude are not reflected well by the written record. *Eastley* at ¶ 21; *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).

**{¶22}** In a permanent custody case the dispositive issue on appeal is "whether the trial court's findings * * * were supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 43; R.C. 2151.414(B)(1). "Clear

and convincing evidence" is "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *State ex rel. Pietrangelo v. Avon Lake*, 149 Ohio St.3d 273, 2016-Ohio-5725, 74 N.E.3d 419, ¶ 14. "[I]f the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *In re R.M.*, 2013-Ohio-3588, 997 N.E.2d 169, ¶ 55 (4th Dist.).

**{¶23}** "The essential question we must resolve when reviewing a permanent custody decision under the manifest weight of the evidence standard is whether the amount of competent, credible evidence presented at trial produced in the court's mind a firm belief or conviction that permanent custody was warranted." *In re T.J.* at ¶ 26.

B. Permanent Custody Principles and Framework

**{¶24}** "The United States Supreme Court has stated that parents' interest in the care, custody, and control of their children 'is perhaps the oldest of the fundamental liberty interests recognized by this Court.' " *In re B.C.,* 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 19, quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). "It is irrefutable that parents have fundamental constitutional rights free from government intervention in their decisions on the custody and caretaking of their children." *In re Mullen*, 129 Ohio St.3d 217, 2011-Ohio-3361, 953 N.E.2d 302, ¶ 26, citing *In re Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971, ¶ 16. "It is also

irrefutable that those rights are not absolute." *Mullen* at ¶ 26; *In re D.A.*, 113 Ohio St.3d 88 2007-Ohio-1105, 862 N.E.2d 829, ¶ 11. Instead, " 'it is plain that the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the pole star or controlling principle to be observed.' " *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting *In re R.J.C.*, 200 So.2d 54, 58 (Fla.App.1974). Thus, the state may terminate parental rights when the child's best interest requires it. *D.A.* at ¶ 11.

**{¶25}** R.C. 2151.353(A)(4) permits a trial court to grant permanent custody of a child that is adjudicated an abused, neglected, or dependent child to a children services agency if the court determines: (1) that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent as provided in R.C. 2151.414(E) and (2) that the permanent commitment is in the best interest of the child as provided in R.C. 2151.414(D)(1)(a)-(e). The mother contests the second prong, the best interest finding. More specifically, she argues that under R.C. 2151.414(D)(1)(d), a legally secure placement could have been achieved with her without granting permanent custody to the agency because she has maintained sobriety for a significant period while in inpatient treatment, has gainful employment, received domestic violence counseling, and has separated from Barnett, her abusive boyfriend.

C. Trial Court's Best Interest Finding

**{¶26}** R.C. 2151.414(D)(1) requires the trial court "to consider 'all relevant factors,' including five enumerated statutory factors * * *. No one element is given greater weight or heightened significance." *In re C.F.*, 113 Ohio St.3d 73, 2007–Ohio–1104, 862 N.E.2d 816, ¶ 57, citing *In re Schaefer,* 111 Ohio St.3d 498, 2006–Ohio–5513, 857 N .E.2d 532, ¶ 6. The five enumerated factors include: (1) the child's interaction and interrelationship

with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the child's wishes, as expressed directly by the child or through the child's guardian ad litem, with due regard for the child's maturity; (3) the child's custodial history; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.

{¶27} The mother contends that she has the ability to provide a legally secure permanent placement. She contends that because she has had a significant period of sobriety, has had domestic violence counseling and separated from Barnett, and has employment, she "was on a tremendous path towards a new and better life" at the time of the permanent custody hearing. The trial court acknowledged that the mother had made progress in these areas, but the court's main concern and a key reason her children were removed from her custody in September 2017 was her involvement with violent men.

{¶28} The record shows that the mother has been involved in no less than five violent relationships and when she is not living with violent men she lives in homeless or women's shelters or inpatient drug treatment facilities. At the time of the hearing, she had lived for six months in an inpatient drug facility. She had extended periods of unemployment and at the time of the hearing worked as a part-time employee in an ice-cream shop. Although the mother claimed to have voluntarily and permanently separated from Barnett, he was incarcerated at the time of the hearing. And, despite having counseling for domestic violence, at the time of the hearing the mother was in another

relationship with a man who had a felony for domestic violence and was on probation for burglary. The mother also admitted to caseworker Myers that she had lied to the court about her contact with Barnett and about the bruises she received from him during the course of the case.

**{¶29}** The mother has made progress on her substance abuse problems and, at the time of the hearing, had maintained approximately five months of sobriety. However, her children were temporarily removed from her care primarily because of domestic violence – an ongoing problem the mother has experienced for over twelve years and which has resulted in the removal of all seven of her children from her custody. The record shows that the mother continues to seek out, cultivate, and maintain relationships with violent men. The evidence supports the trial court's finding that the mother's actions show an unwillingness to provide an adequate permanent home for the children.

**{¶30}** After weighing the evidence and all reasonable inferences, considering the credibility of the witnesses after according the requisite deference to the trial court's determinations, we conclude that in resolving evidentiary conflicts, the trial court did not clearly lose its way or create a manifest miscarriage of justice so that we must reverse its judgment awarding permanent custody of the children to the agency. We overrule the mother's sole assignment of error and affirm the judgment of the trial court awarding permanent custody to the agency.

## IV. CONCLUSION

**{¶31}** The trial court's determinations that the permanent commitment is in the best interest of the children are not against the manifest weight of the evidence. Having

overruled the assignment of error, we affirm the judgment of the trial court awarding permanent custody of the children to the agency.

JUDGMENT AFFIRMED.

## <u>JUDGMENT ENTRY</u>

It is ordered that the JUDGMENT IS AFFIRMED and that Appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Pike County Court of Common Pleas, Juvenile Division to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. & McFarland, J.: Concur in Judgment and Opinion.


For the Court



BY: _____
Michael D. Hess, Judge




**NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**