[Cite as *In re J.B.*, 2020-Ohio-3351.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ATHENS COUNTY

| | | |
|---|---|---|
| In re J.B. | : | Case No. 20CA1 |
| Adjudicated neglected and dependent child | : | <u>DECISION AND</u> <u>JUDGMENT ENTRY</u> |
| | : | |

_____
<u>APPEARANCES</u>:

Ryan Shepler, Kernen & Shepler, LLC, Logan, Ohio, for appellant.

Keller J. Blackburn, Athens County Prosecutor, and Timothy L. Warren, Athens County Assistant Prosecutor, Athens, Ohio, for appellee.
_____
Hess, J.

{¶1}   R.B. ("Mother") appeals from a judgment of the Athens County Common Pleas Court, Juvenile Division, that awarded permanent custody of her child to Athens County Children Services ("ACCS").   Mother contends the evidence does not support the court's findings that ACCS did not have to use reasonable efforts to reunify the family, that the child could not be placed with either parent within a reasonable time or should not be placed with the parents, and that a grant of permanent custody to ACCS was in the child's best interest.   Mother also claims that the court should have granted the child's maternal grandmother custody.   However, after weighing the evidence and all reasonable inferences, considering the credibility of the witnesses after according the requisite deference to the trial court's determinations, we conclude that in resolving evidentiary conflicts, the court did not clearly lose its way or create a manifest miscarriage of justice so that we must reverse its permanent custody award.   We overrule Mother's assignments of error and affirm the trial court's judgment.

## I.  FACTS AND PROCEDURAL HISTORY

{¶2}   Mother and J.F. ("Father") are the parents of J.B., who was born in September 2015.   J.B. has cystic fibrosis, a progressive disease that causes thick mucus to collect in the airways, resulting in difficulty breathing.   Medical professionals have recommended that at least twice a day, J.B. receive vest therapy where he spends about 30 minutes in a vibrating vest to loosen mucus to clear airways.   Most patients with cystic fibrosis, including J.B., have pancreatic insufficiency, i.e., the pancreas does not produce enzymes in the right way to allow the body to absorb nutrients to grow and develop.   J.B. takes nineteen daily medications, including enzymes and vitamins, that are administered via tube or nebulizer.   He struggles with eating and receives nutrition via tube.

{¶3}   In February 2019, ACCS filed a complaint asserting J.B. appeared to be an abused, neglected, and dependent child. ACCS alleged it had information that Mother was not complying with the recommendations of J.B.'s doctors or giving him enough calories and that he had been admitted to Nationwide Children's Hospital ("NCH") due to critical complications of cystic fibrosis and malnutrition, had gone into cardiac arrest due to malnutrition, and was in a medically induced coma. ACCS requested temporary custody but later amended its complaint to request permanent custody. ACCS also moved for emergency custody during the pendency of the proceedings.

{¶4}   The court granted ACCS emergency custody of J.B. His maternal grandmother, L.B. ("Grandmother"), moved to intervene, for grandparent visitation, and for temporary or permanent custody.  The court denied intervention and visitation and

found the motion for custody premature because the adjudication had not yet occurred. After the adjudicatory hearing, the court found J.B. was a neglected and dependent child, and Grandmother renewed her motions.

{¶5} In November and December 2019, the court conducted a dispositional hearing. ACCS introduced medical and other records into evidence which indicate Mother has a history of not following recommendations for J.B.'s care, resulting in conflict between her and his medical providers. For instance, prior to December 2018, she had not done the recommended vest therapy for over a year or given J.B. prescribed, FDA approved enzymes for several months. The records indicate J.B. was admitted to NCH on December 25, 2018 with "hypoxic respiratory distress, edema secondary to hypoalbuminemia in the setting of moderate malnutrition due to medical neglect." His condition "[p]rogressed to respiratory failure requiring prolonged intubation in the [pediatric intensive care unit], complicated by cardiac arrest * * *." He was hospitalized for 92 days during which his medical team contacted ACCS.

{¶6} Kelly Sakellaris, a cystic fibrosis dietician, testified that on December 26, 2018, she did a consult for a nutrition assessment of J.B., and he exhibited signs of malnutrition. His "whole body was swollen" due to "extreme fluid overload," and his protein levels were low. Sakellaris testified that based on what Mother told her about J.B.'s diet, he was getting 900 to 1000 calories a day when he needed 1800 to 2200 calories a day at that time. Sakellaris testified that Mother's use of unapproved enzymes was a "huge concern" due to the lack of evidence-based research on their safety and effectiveness and the fact that there were several months when J.B. had not been seen at a cystic fibrosis center. She testified that J.B. made "great progress" in the hospital,

and his protein levels normalized.  She detailed his current nutrition plan and testified that he was "growing as expected for a child his age and his gastrointestinal symptoms have greatly improved over the past several months."

{¶7}   Dr. Katelyn Krivchenia, a pediatric pulmonologist at NCH, testified that she was J.B.'s attending physician in September 2019 when he was hospitalized for a few days due to a mild pulmonary exacerbation and rhino/enterovirus, i.e., the common cold.  Dr. Krivchenia reviewed records from J.B.'s recent hospital stays to formulate her treatment plan.  She testified that when J.B. was admitted in December 2018, he was "almost dead.  He almost died." She opined that J.B. was malnourished due to insufficient enzymes or calories and that "there's no reason that a child in this day and age should be presenting to a hospital with such severe malnourishment.  No reason that they should go into cardiac arrest because of that malnourishment.  We have medications.  It was completely, completely avoidable."  Dr. Krivchenia testified that for cystic fibrosis patients, a body mass index ("BMI") over the 50th percentile is generally an indicator of good health.  Although J.B. "weighed a lot" in December 2018 and his BMI was in the 80th percentile, he had "a lot of fluid weight," and his albumin level, a marker of the amount of protein in the body, was "severely low."  J.B. received medication to expel the fluid, and at the time of his March 2019 discharge, his BMI was in the 11th percentile.  Dr. Krivchenia testified that when she treated J.B. in September 2019, his albumin level was normal, his BMI was in the 90th percentile, and it "seemed like he was being very well-cared for and getting all of his treatments."  She explained it is "very common" for cystic fibrosis patients to be hospitalized several days due to viral illness and noted J.B. was also hospitalized in May 2019 due to pneumonia.

{¶8} Arissa Nelson, an ongoing caseworker at ACCS, testified that she was assigned to J.B.'s case in February 2019. When she met J.B., he was in a wheelchair and barely spoke, but at the time of the dispositional hearing he was "a different kid" and could run and say short sentences. Nelson opined that J.B. would not receive proper care if returned to Mother or placed with Grandmother because Mother did not agree with or follow cystic fibrosis protocols, Mother often blamed hospital staff "for the events that have [led] us to today," and "even through case planning meetings," Mother and Grandmother "agreed on [J.B.'s] care." Nelson testified that Mother had been verbally aggressive and abusive towards ACCS employees and was not allowed to go to NCH appointments because hospital staff did not feel that would be productive.

{¶9} Gary Wolfgang, Ph.D., completed a psychological evaluation of Mother and found "a pattern of emotional and subsequent behavioral dyscontrol in which [Mother] engages in the display of anger, irritability, and disgust accompanied by behavioral argumentativeness, highly opinionated statements * * *, insulting comments, and profanity, among other negative traits." He was "inclined to offer diagnoses centered on a mood disorder that is closer to bipolar than unipolar and elements of a personality disorder that contains multiple dysfunctional interpersonal elements." Dr. Wolfgang explained his evaluation "did not produce clear evidence one way or the other as to how" Mother's traits "manifested themselves in [her] day to day care of her child." The traits were "more relevant in describing and explaining her reactions to hospital personnel and agency personnel once the case was underway." He recommended "psychotherapy and psychotropic medications" that were "frequent and ongoing for a

considerable period of time" to reduce "reactivity and foster more cooperative interpersonal traits and behaviors."

**{¶10}** Stephanie Blaine, a kinship caseworker at ACCS, testified that she looked for relative placements for J.B. ACCS wanted to consider placement with a maternal aunt in Michigan, but Mother opposed it. ACCS did not approve placement with Grandmother. Although she did not have a criminal history or safety hazards in her home, Blaine testified Grandmother's interview raised concerns about her ability to care for J.B. Grandmother told Blaine that she did not agree with cystic fibrosis protocols, that J.B. had not been malnourished, and that medical personnel caused his cardiac arrest. Grandmother also made statements indicating she and Mother made decisions as a team.

**{¶11}** Kylie Langstaff was J.B.'s foster mother from the time of his discharge in March 2019 until August 2019. When she initially met J.B. prior to his discharge, he "would scream all the time" during vest treatments. However, Langstaff testified that he did not like hospital personnel, and with her help, J.B.'s behavior improved. Langstaff testified that at her home, J.B. would sometimes "growl a little bit" about vest therapy but otherwise did it without issue. His walking and speech improved, and he gained weight. Langstaff stopped caring for J.B. because she had a high-risk pregnancy and was tired of Mother making unfounded accusations about J.B.'s care.

**{¶12}** Riann Sullivan became J.B.'s foster mother in August 2019. Sullivan testified while in her care, J.B. has done vest therapy without issue, his speech has improved, and he has started learning basic self-care tasks. J.B. had been vomiting four or five times a day but that had resolved. Sullivan testified that J.B. was "thriving"

under the "consistency and structure" in her home, had bonded with his foster family, and could stay with them until another alternative was found.

{¶13} Jenny Stotts, J.B.'s guardian ad litem, testified that after observing J.B. in foster care, reviewing medical records and other documents, and interviewing individuals connected to the case, she recommended that the court grant ACCS permanent custody. Stotts testified that J.B. requires a "certain standard of care that's evidence based" and needs a caregiver who is "willing to follow through on the standard" and "can coordinate his care and develop working relationships" with medical providers. Stotts opined that J.B. was bonded with Mother and Grandmother, but they could not meet his needs.

{¶14} Grandmother testified that she had attended J.B.'s medical appointments and knew Mother was non-compliant with some recommended protocols. Grandmother knew doctors wanted J.B. to have vest therapy but claimed J.B. would scream "his head off" during the treatment, and Mother did not have enough oxygen to "keep it up." Grandmother also knew J.B. was receiving an "alternative enzyme," but testified that Mother made the decisions about his care, and Grandmother followed Mother's instructions when she watched J.B. even though she did not agree with all of Mother's decisions. Grandmother testified that Mother has a history of gastrointestinal issues, and in December 2018, Grandmother took care of J.B. intermittently because Mother had food poisoning. When Grandmother returned J.B. to Mother on Christmas Eve, his stomach was "[a] little bloated," which she attributed to a constipation issue. Grandmother testified that to her knowledge, Mother always gave J.B. more calories than were recommended. Although Grandmother testified that she now knew J.B. had

not been absorbing enough protein, she admitted that she had attributed his December 2018 hospitalization to issues caused by weight gain and blamed a doctor for his cardiac arrest.  Grandmother claimed that if she got custody, she would "follow protocol to the letter."

{¶15} Mother testified that she made healthcare decisions for J.B., not Grandmother.  Mother testified that she did not think people should use medicine.  She stated, "I think you should live what life God gives you.  Good or not good.  Sick, happy, healthy, sad, depressed.  You live it.  That's it." However, Mother testified that she followed medical recommendations for the first year-and-a-half of J.B.'s life until she "had enough," performed her own research, and did what she wanted to do.  Mother testified that she did not do vest therapy because J.B. "would scream until he would turn purple" and she "could not support him on 2 liters of oxygen in my home and that's all I had access to."  Mother admitted there was "a possibility" that her decisions, such as her choice of enzymes, played a role in the December 2018 hospitalization, but claimed J.B. was receiving the calories he needed, partially blamed a doctor for the hospitalization, and blamed a doctor for J.B.'s cardiac arrest.  Mother admitted that she had repeatedly disregarded medical advice, but claimed that she would follow it to regain custody of J.B.  She also testified that she had taken an online parenting class and anger management class and restarted counseling. She was not taking any medications for mental health issues but testified that her counselor had not referred her for a medication assessment.  Mother testified that since losing custody of J.B., she had been living with Grandmother or Mother's boyfriend. Mother claimed that if she regained

custody, she would get a house, and if Grandmother got custody, Mother was willing to stop coming to her house.

{¶16} The court denied Grandmother's motions and granted ACCS permanent custody. The court found ACCS had not made reasonable efforts to reunite Mother and J.B. but did not have to because she repeatedly withheld medical treatment and nutrition from him under R.C. 2151.419(A)(2)(b). The court found that J.B. presented at NCH in December 2018 "as severely malnourished" and that he was "medically neglected by his mother in spite of numerous efforts to educate and convince her of his various specific needs; especially airway clearance and enzymes." The case did not present "a matter of legitimate differing opinions as to diagnosis or plan of care for some random medical issue"; rather, J.B.'s cystic fibrosis required "a very specific regimen of care involving precise schedule compliance each and every day." The court found ACCS did not have to make reasonable efforts to reunite Father and J.B. because Father abandoned him under R.C. 2151.419(A)(2)(d).

{¶17} The court found J.B. could not be placed with either parent within a reasonable time or should not be placed with his parents. It found Father abandoned J.B. for purposes of R.C. 2151.414(E)(10). Regarding Mother, the court examined R.C. 2151.414(E)(2), (8), (14), and (16) and discussed the factors "collectively as they are intertwined," stating:

> Mother very clearly is actively opposed to the specific, but necessary, standards of care for her son's health. * * * While mother is comfortable speaking in medically relevant terminology, it remains unconvincing and unsupported by reliable medically recognized authority. Her fractured relationship with the specialized medical experts might be somewhat explained by findings and observations in Dr. Wolfgang's report about her rigidity and the way her anger has often led to negative behaviors. It's not necessary for the Court to find a specific link between mother's mental

health concerns and her history of being J.B.'s sole custodian.  There is such a body of evidence to establish that for whatever reasons mother is unwilling or unable to accept and adhere to the correct best medical advice * * *.

The court found that returning J.B. to Mother's care would be irresponsible.  The court noted that "[e]ven under her attorney's carefully guided direct examination [Mother] was barely able to claim that if only she could have her son returned, she would listen to the experts and follow their recommendations," and  "within the next couple of responses she would reveal that she truly doesn't believe that she's been wrong about or mishandled J.B.'s care."  Although Mother had restarted counseling, the court found that "any acknowledgement of wrong doing [sic] or sincere commitment to accepting medical direction is far from convincing."

{¶18}  The court found it was in J.B.'s best interest to grant ACCS permanent custody.  Regarding J.B.'s interactions and interrelationships with others, the court found Mother and Grandmother had "always been in charge of all decisions regarding the care J.B. did or did not receive" and "been his only direct care providers for practical purposes."  J.B. had no siblings and was abandoned by Father, and Mother and J.B.'s aunt had a "fractured relationship."  J.B. had "done well in both his specialized foster placements."  The court also found J.B. was "far too young to have a meaningful and informed opinion on custody, but we can assume that he loves his mother * * *."  Regarding custodial history, the court found "J.B. has always lived with his mother with only limited short term stays with his grandmother.  Since the initiation of this case he has continuously been in foster care."  The court also found "J.B. needs and deserves a legally secure placement, and sadly that cannot be with his biological family.  He needs an adoptive family that will listen and adhere to his critically important treatment and

daily care requirement[s]." The court found Grandmother "failed to distinguish herself as a true independent decision maker to any degree that the Court could comfortably trust that matters would not revert to the prior nightmare. In fact, as of our last hearing date mother had no independent housing and was living primarily with her mother." In addition, the court found R.C. 2151.414(E)(8) and (10) applied to the best interest analysis.

## II. ASSIGNMENTS OF ERROR

**{¶19}** Mother presents the following assignments of error:

1. The trial court erred by failing to require ACCS to use reasonable efforts to reunify the family prior to filing its permanent custody motion.

> a. The trial court's determination that [Mother] repeatedly withheld medical treatment and nutrition from the child is not supported by competent credible evidence.

> b. Athens County Children Services failed to make *any* efforts to reunify the family.

2. The trial court erred in finding that "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents."

> a. The trial court found that [Mother's] mental illness dictates that the child cannot or should not be placed with [Mother] within a reasonable time, but did not find that this condition could not be resolved within one year.

> b. The trial court erred by finding that [Mother] has repeatedly withheld medical treatment or food when she has the means to provide the treatment or food; and that she is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

3. The trial court erred in finding, by clear and convincing evidence, that granting permanent custody is in the child's best interests.

4. The trial court erred by denying [Grandmother's] motion for custody.

## III.  LAW AND ANALYSIS

### A.  Standard of Review

**{¶20}**  This court has explained:

A reviewing court will not reverse a trial court's judgment in a permanent custody case unless it is against the manifest weight of the evidence.  See *In re T.J.*, 4th Dist. Highland Nos. 15CA15 and 15CA16, 2016-Ohio-163, ¶ 25. "To determine whether a permanent custody decision is against the manifest weight of the evidence, an appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving evidentiary conflicts, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Id.* at ¶ 25, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20. In reviewing evidence under this standard, we defer to the trial court's determinations of matters of credibility, which are crucial in these cases, where demeanor and attitude are not reflected well by the written record.  *Eastley* at ¶ 21; *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).

In a permanent custody case the dispositive issue on appeal is "whether the [juvenile] court's findings * * * were supported by clear and convincing evidence."  *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 43 * * *. "Clear and convincing evidence" is "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."  *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *State ex rel. Pietrangelo v. Avon Lake*, 149 Ohio St.3d 273, 2016-Ohio-5725, 74 N.E.3d 419, ¶ 14. "[I]f the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence."  *In re R.M.*, 2013-Ohio-3588, 997 N.E.2d 169, ¶ 55 (4th Dist.).

*In re C.S.*, 4th Dist. Pike No. 19CA899, 2019-Ohio-5109, ¶ 21-22.

B.  Reunification Efforts

{¶21} In the first assignment of error, Mother contends that ACCS made no effort to reunify the family and that the trial court erred when it concluded ACCS did not have to prove it made reasonable efforts to do so pursuant to R.C. 2151.419(A)(2)(b) because the finding that she repeatedly withheld medical treatment and nutrition from J.B. is not supported by competent, credible evidence.  Mother asserts that children with cystic fibrosis require "extensive and complicated medical care," and "[e]ven in the best of times * * * may have frequent hospital stays and have serious illnesses."  Mother notes that while in foster care, J.B. lost two pounds, had vomiting issues, and was hospitalized twice through no fault of his foster parents.  She claims that the December 2018 hospitalization "was not the result of poor care" by her and was "typical of children with cystic fibrosis."  Mother argues that even if she caused that hospitalization, there is no evidence she withheld medical treatment or nutrition on multiple occasions.  She claims the "undisputed testimony was that J.B. was largely healthy from 2016 through December 2018" and that the December 2018 hospitalization "coincided with [her] illness."

{¶22} Generally, at a R.C. 2151.353 dispositional hearing at which the court "continues the removal a child from the child's home," a public children services agency has the burden to prove that it "has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home."  R.C. 2151.419(A)(1).  If "[t]he parent from whom the child was removed has repeatedly withheld medical treatment or food from the child when the parent has the means to

provide the treatment or food" and the parent has not "withheld medical treatment in order to treat the physical or mental illness or defect of the child by spiritual means through prayer alone, in accordance with the tenets of a recognized religious body," the court "shall make a determination that the agency is not required to make" those reasonable efforts. R.C. 2151.419(A)(2)(b).

{¶23} ACCS presented competent, credible evidence that would produce a firm belief that Mother repeatedly withheld medical treatment and nutrition from J.B. Mother admitted that after the first year-and-a-half of J.B.'s life, she repeatedly disregarded the recommendations of his doctors. Mother was not giving J.B. the recommended vest therapy. Mother also was not giving J.B. his prescribed, FDA approved enzymes and was instead giving him enzymes that were not FDA approved and lacked evidence-based research on their safety and effectiveness. Although Mother and Grandmother claimed that J.B. was receiving the calories needed each day, the trial court was free to reject this testimony, particularly given Sakellaris's testimony to the contrary and other evidence that J.B. was malnourished when he was admitted to NCH in December 2018, such as his low albumin levels and low BMI following the loss of excess fluid weight. Mother's suggestion that the 92-day hospital stay was somehow typical for a child with cystic fibrosis is undercut by Dr. Krivchenia's testimony that J.B. "almost died" and that there was no reason for a child to present to the hospital with "such severe malnourishment" or to "go into cardiac arrest" because of it. Notably, once J.B. was under the care of foster parents who followed medical advice, his nutritional status improved and he was growing as expected for his age.

{¶24} The trial court's finding that Mother repeatedly withheld medical treatment and nutrition from J.B. for purposes of R.C. 2151.419(A)(2)(b) was not against the manifest weight of the evidence. We overrule the first assignment of error.

### C. Placement with the Parents

{¶25} In the second assignment of error, Mother contends the trial court erred when it found J.B. could not be placed with her within a reasonable time or should not be placed with her. Mother asserts no evidence supports a R.C. 2151.414(E)(2) finding that her mental illness could not be resolved within one year of the dispositional hearing. She notes Dr. Wolfgang opined that with treatment, it was possible "she could calm herself to the point that her ability to relate to medical and agency personnel in the future would be greatly enhanced" and claims she was not given time to obtain treatment. Citing her arguments in the first assignment of error, Mother claims no evidence supports a R.C. 2151.414(E)(8) finding that she repeatedly withheld medical treatment and nutrition or a R.C. 2151.414(E)(14) finding that she is unwilling to provide basic necessities. She also asserts that any withholding or unwillingness was "the result of mental illness, which may have been resolvable within one year" of the dispositional hearing.

{¶26} The trial court may not commit a neglected or dependent child to the permanent custody of a public children services agency under R.C. 2151.353(A)(4) unless it determines "in accordance with division (E) of section 2151.414 of the Revised Code that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent * * *." R.C. 2151.414(E) states that "[i]f the court determines, by clear and convincing evidence," that one or more of sixteen

statutorily enumerated factors "exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent[.]" *Id.* The trial court examined the following R.C. 2151.414(E) factors with respect to Mother:

> (2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing * * * for the purposes of division (A)(4) of section 2151.353 of the Revised Code;
>
> * * *
>
> (8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.
>
> * * *
>
> (14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.
>
> * * *
>
> (16) Any other factor the court considers relevant.

{¶27} The trial court's determination that R.C. 2151.414(E)(8) applied is supported by the same evidence detailed in Section III.B that supported the R.C. 2151.419(A)(2)(b) determination. Contrary to what Mother implies, R.C. 2151.414(E)(8) does not require a finding that any mental illness that contributed to Mother's decision to repeatedly withhold medical treatment or nutrition from J.B. could not be resolved within a year of the dispositional hearing. Because the determination that R.C. 2151.414(E)(8)

applied is not against the manifest weight of the evidence, the trial court did not err when it found J.B. could not be placed with Mother within a reasonable time or should not be placed with Mother, and it is not necessary for us to evaluate the other R.C. 2151.414(E) factors the trial court examined with respect to her.  We overrule the second assignment of error.

### D.  Best Interest of the Child

**{¶28}** In the third assignment of error, Mother contends that the trial court erred when it found a grant of permanent custody to ACCS was in the best interest of J.B. Mother asserts J.B. is bonded with her and Grandmother and that they "are the only guarantees of long-term stability" for him.  Mother emphasizes the fact that J.B. had two foster placements in a nine-month period.  She asserts that J.B. had difficulty bonding with his first foster mother and that even though J.B. may have bonded with his current foster parents, that placement "has no promise of stability" because "the foster parents are only willing to keep him until a long-term alternative arises."  Mother also challenges the trial court's finding that R.C. 2151.414(E)(8) applies to the best interest analysis.

**{¶29}** In the fourth assignment of error, Mother contends the court should have granted Grandmother's motion for custody.   Mother asserts this is a "suitable alternative" to permanently severing the family relationship because Grandmother is "strongly bonded with J.B.," has no criminal record, has a safe home, and testified about her willingness to follow medical advice. Mother claims ACCS's "uncorroborated assumption" that Grandmother and Mother made decisions about J.B.'s care as a team was contradicted by Grandmother's testimony.

{¶30} The third and fourth assignments of error present related issues because if a grant of permanent custody to the agency is in J.B.'s best interest, a grant of custody to Grandmother necessarily is not. *In re S.S.-1*, 4th Dist. Athens No. 17CA44, 2018-Ohio-1349, ¶ 74. Therefore, we will consider these assignments of error together.

{¶31} The trial court may not commit a neglected or dependent child to the permanent custody of a public children services agency under R.C. 2151.353(A)(4) unless it "determines in accordance with division (D)(1) of section 2151.414 of the Revised Code that the permanent commitment is in the best interest of the child."

{¶32} R.C. 2151.414(D)(1) states:

In determining the best interest of a child * * * the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

No one factor has "greater weight or heightened significance." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57. "Instead, the trial court considers the

totality of the circumstances when making its best interest determination." *In re Z.M.*, 4th Dist. Scioto No. 18CA3856, 2019-Ohio-2564, ¶ 24.

### 1.  Interactions and Interrelationships of the Child

**{¶33}** The record contains some evidence that J.B. was bonded with Mother and Grandmother, who had been his caregivers.  Mother does not challenge the trial court's finding that Father abandoned J.B.  She also does not dispute the finding that she has a fractured relationship with J.B.'s aunt, which presumably impacted J.B.'s ability to have a relationship with her.  In addition, evidence supports the trial court's finding that J.B. has done well in his specialized foster placements.  His foster parents and medical professionals testified to the progress he has made in those placements, and J.B.'s current foster mother testified that he had bonded with his foster family.

### 2.  Wishes of the Child

**{¶34}** As the trial court found, J.B. is too young to have a meaningful and informed opinion on custody but presumably loves Mother.

### 3.  Custodial History

**{¶35}** Before ACCS instituted this action, J.B. was in the custody of Mother and occasionally stayed with Grandmother.  Since ACCS instituted this action, J.B. has been in the custody of ACCS and in foster care.  At the time of the permanent custody hearing, J.B. had not been in the temporary custody of ACCS for twelve or more months of a consecutive twenty-two month period.

### 4.  Legally Secure Permanent Placement

**{¶36}** We have generally interpreted the phrase "legally secure permanent placement" to "mean a safe, stable, consistent environment where a child's needs will

be met." *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 56. "A legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *Id.*

**{¶37}** R.C. 2151.414 "does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor. The statute does not even require the court to weigh that factor more heavily than other factors." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 64. "Therefore, courts are not required to favor relative * * * placement if, after considering all the factors, it is in the child's best interest for the agency to be granted permanent custody." *S.S.-1*, 4th Dist. Athens No. 17CA4, 2018-Ohio-1349, at ¶ 74.

**{¶38}** Competent, credible evidence supports the trial court's finding that J.B.'s need for a legally secure permanent placement cannot be met by Mother or Grandmother. The record indicates that Mother has repeatedly disregarded cystic fibrosis protocols. The trial court, which was in the best position to judge credibility, was free to reject Mother's testimony that she would follow medical advice if she regained custody, particularly given her past history, which this court has recognized is "one of the best predictors of future behavior." *Z.M.*, 4th Dist. Scioto No. 18CA3856, 2019-Ohio-2564, at ¶ 33. The court was also free to reject Grandmother's testimony that she would follow medical advice if she got custody of J.B. Blaine testified that Grandmother told her that she did not agree with cystic fibrosis protocols, and as the trial court pointed out, Grandmother knew Mother's approaches to airway clearance and enzymes were contrary to the recommendations of medical experts, Grandmother had been

complicit in Mother's refusal to follow them, and at the time of the dispositional hearing, Mother was living with Grandmother when not at Mother's boyfriend's home.

**{¶39}** Mother's suggestion that the record shows J.B.'s need for a legally secure permanent placement cannot be achieved with a grant of permanent custody to ACCS is not well-taken. Mother is correct that J.B. had two foster placements in nine months and that it appears his current foster placement will not be permanent. However, ACCS presented evidence that the first foster placement ended due to the foster mother's high-risk pregnancy and Mother's own conduct, and J.B.'s current foster parents are willing to continue acting in that capacity until ACCS finds an alternative. It is possible that ACCS could facilitate a placement with J.B.'s aunt, but because of Mother's opposition, ACCS was unwilling to pursue that option without a grant of permanent custody.

### 5. Factors in R.C. 2151.414(E)(7) to (E)(11)

**{¶40}** The trial court found Mother repeatedly withheld medical treatment and nutrition pursuant to R.C. 2151.414(E)(8), and Father abandoned J.B. pursuant to R.C. 2151.414(E)(10). We rejected Mother's challenge to the R.C. 2151.414(E)(8) finding in Section III.C, and she does not challenge the abandonment finding.

### 6. Totality of the Circumstances

**{¶41}** Based on the foregoing, we conclude that the decision to deny Grandmother's motion for custody and grant ACCS permanent custody was not against the manifest weight of the evidence. ACCS presented competent and credible evidence upon which the trial court reasonably could have formed a firm belief that a grant of

permanent custody to ACCS was in the best interest of J.B. and that placement with

Grandmother was not.  We overrule the third and fourth assignments of error.

                                    IV.  CONCLUSION

{¶42} Having overruled the assignments of error, we affirm the trial court's

judgment.

                                                            JUDGMENT AFFIRMED.

## **<u>JUDGMENT ENTRY</u>**

It is ordered that the JUDGMENT IS AFFIRMED and that Appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Athens County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Abele, J.:  Concur in Judgment and Opinion.


For the Court



BY: _____
        Michael D. Hess, Judge



### **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**