[Cite as *In re H.B.*, 2020-Ohio-4323.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

IN THE MATTER OF H.B.       :     Case No. 20CA3708

ALLEGED DEPENDENT CHILD   :     <u>DECISION AND</u>
                                     <u>JUDGMENT ENTRY</u>

**RELEASED 8/26/2020**
_____
<u>APPEARANCES</u>:

Chase C. Rutherford, Chillicothe, Ohio, for appellant.

Jeffrey C. Marks, Ross County Prosecuting Attorney, and Jennifer L. Ater, Ross County Assistant Prosecuting Attorney, Chillicothe, Ohio, for appellee.
_____
Hess, J.

**{¶1}** T.B. ("Mother") appeals from a judgment of the Ross County Common Pleas Court, Juvenile Division, that awarded permanent custody of her child to South Central Ohio Job & Family Services, Children's Division (the "Agency"). Mother contends that the trial court erred when it found the grant of permanent custody was in the best interest of the child. However, after weighing the evidence and all reasonable inferences, considering the credibility of the witnesses after according the requisite deference to the trial court's determinations, we conclude that in resolving evidentiary conflicts, the court did not clearly lose its way or create a manifest miscarriage of justice so that we must reverse its permanent custody award. We overrule Mother's assignment of error and affirm the trial court's judgment.

I. FACTS AND PROCEDURAL HISTORY

**{¶2}** Mother and J.C. ("Father"), who died during the pendency of these proceedings, are the biological parents of H.B. On August 16, 2017, an Agency

caseworker filed a complaint asserting that H.B., then age seven, appeared to be a dependent child based on information that, among other things, Mother and the child did not have a stable address, the parents used drugs, the family had been in a hotel room "full of syringes" where police arrested Father on an active warrant, and the child had not been enrolled in school. The complaint requested a disposition of temporary custody to the Agency. The Agency obtained temporary emergency custody of the child, and after a shelter care hearing, the magistrate ordered that the child remain in the Agency's temporary custody until further order.

{¶3} The court adjudicated the child a dependent child, and after a dispositional hearing, the child remained in the temporary custody of the Agency until June 7, 2019, when the magistrate granted the Agency's motion to return custody to Mother with court-ordered protective services so that the Agency could monitor the child while in her home.[1] The basis for the motion was that Mother had completed all of her case plan services, had a full-time job, had her own home, had consistently visited the child, and had unsupervised weekend or overnight visits for five months with no issues. On July 16, 2019, the Agency moved for an emergency return of temporary custody to it alleging that Mother had admitted to a heroin relapse, that the child had been placed on a safety plan with his former foster parent, and that Mother had completed a drug screen that was positive for benzodiazepine and fentanyl. The magistrate granted the motion and returned temporary custody to the Agency. A month later, the Agency moved for

---

[1] The February 6, 2018 dispositional order appears to contain a misstatement. Despite finding that the "continued residence of the child in or return to the home would be contrary to the child's best interest and welfare," the court ordered that the child "remain in the temporary custody of mother." However, the child was in the Agency's temporary custody at that time, and the record reflects that after the court issued the dispositional order, the child remained in the temporary custody of the Agency except from June 7, 2019, through July 16, 2019.

permanent custody under R.C. 2151.413. The child's guardian ad litem reported that the child was very happy in his foster home and preferred to stay there, and the guardian ad litem recommended that the court grant the Agency's motion.

{¶4} During the hearing on the motion, Elizabeth Ratcliff, a placement supervisor at the Agency, testified that from August 2017 until late 2018, she was an ongoing caseworker assigned to the child's case, and she later monitored the case as a supervisor. Ratcliff developed a case plan that required that Mother obtain safe and stable housing, complete parenting classes, complete drug treatment at The Breaking Point, complete an alcohol and other drug assessment, follow through with any recommendations, and maintain regular contact with the Agency and child. Mother did not complete treatment at The Breaking Point. Mother later completed a week-long detox and was supposed to go to Georgia Harris House but did not, reporting that the child was in the hospital. The foster mother reported that the child was in school. Ratcliff testified that Mother completed a treatment program through St. Lucy's around May 2018. However, she later relapsed and went to a homeless shelter, Seeds of Hope. She did well there and submitted to drug screens, which were negative. Ratcliff testified that Mother and the child were bonded and that she believed the child loved Mother. Ratcliff explored relative placements for the child without success. Ratcliff testified that the child had done "very well" in Agency custody. Even though he had never been to school and had to start in kindergarten when he should have been in second grade based on his age, "he excelled quickly."

{¶5} Jessica Benner, an ongoing case worker at the Agency, testified that after the Agency got temporary custody of the child in August 2017, he was placed in a foster

home with Cynthia Walker. On June 7, 2019, the child was returned to Mother's custody, but on July 10, 2019, the child was placed with Walker under a safety plan because Mother admitted that she had a heroin relapse and might test positive for drugs. Mother testified positive for benzodiazepine and fentanyl. The child was returned to the temporary custody of the Agency on July 16, 2019, and remained with Walker. Mother had supervised visitation one hour a week, which was gradually increased to unsupervised 12-hour visits. However, Benner testified that visitation was curtailed in December 2019 because Mother was arrested while with the child, and his foster mother found videos of the child driving, some of which contained Mother's voice. Benner testified that the child was bonded with Mother, but after the arrest, he seemed angry and cried often, and the Agency had increased his counseling and therapy.

{¶6} Benner testified that Mother had maintained regular contact with her but did not complete parenting classes or maintain stable housing. Benner testified that she was concerned about Mother's ability to maintain sobriety. The only drug treatment program Benner had proof that Mother completed was the program at St. Lucy's. Benner testified that after Mother left Seeds of Hope, she began treatment at BrightView, where her drug screens were consistently positive. BrightView's records reflect that Mother was discharged at her request against medical advice. Benner testified that Mother also went to the Southern Ohio Medical Center for a day but left against medical advice. Mother reported going to the Chillicothe Treatment Center beginning July 2019, but Benner never received records from that facility. As a result, Benner connected Mother with American Court Services for drug testing, but Mother quit testing there in December 2019. Benner tried to perform saliva drug screens on

Mother in January and February 2020, but Mother claimed she could not produce enough saliva for the tests. Benner had concerns about Mother's ability to provide for the child because she had had four or five jobs since June 2019, and the Agency had previously given her assistance with housing and utility bills. Benner testified that the child was doing well in school, had bonded with his foster mother, and was a candidate for adoptive placement with her.

{¶7} Cynthia Walker testified that she has been the child's foster mother since his removal with the exception of the period when Mother regained custody. Walker testified that on December 14, 2019, Mother was arrested while with the child, and Walker picked him up from the police station. Later, Walker found videos on the child's cell phone of him driving a car, and Walker heard Mother's voice on them. Walker testified that the child was bonded with Mother and loves her but had been "a little bit more standoffish" toward her since the arrest. When Walker became the child's foster mother, he did not know his ABCs and could not count to 10. However, he is now a straight "A" student and an "awesome reader," and he participates in the Success After School program and wrestling. Walker testified that the child has bonded with her and that if the Agency received permanent custody, she was willing to adopt him.

{¶8} Officer Cody Moore with the Chillicothe Police Department testified that on December 14, 2019, he investigated a report of a female shoplifter fleeing from a Walmart in a green sedan. Mother was the driver of the vehicle, and the child was a passenger. Mother admitted that she was previously barred from entering the Walmart and was arrested and charged with theft, criminal trespass, and driving under

suspension. The charges were still pending on the last day of the permanent custody hearing.

{¶9} Mandy Tripp testified that she is an operation specialist at American Court Services, which performs drug testing services for the Agency using a random call in system. Participants must call each day during a specific time window, and the system randomly determines whether they must come in for testing that day. Mother signed up for this service in October 2019. As of February 21, 2020, Mother had made 58.82% of the required calls and completed 62.5% of her scheduled tests. All 20 of her completed tests were positive. From September 3, 2019, to December 13, 2019, the only substance Mother tested positive for was methadone, and some notes from American Court Services indicate she had a prescription for it. Mother did not complete any tests after December 13, 2019.

{¶10} Mother testified that prior to the child's removal, he participated in six months of kindergarten online, and she and the child lived with a friend of hers but stayed with Father at the Chillicothe Inn every other weekend. After the child's removal, Mother stayed with her mother for about three months. Then she lived at a treatment facility, St. Lucy's, for five months. St. Lucy's helped her get an apartment, which she had for about four months. Mother next spent a month and a half at Seeds of Hope. She then lived in rental housing for over a year but quit working so that she "could stay focused on trying to get [the child] back home" and was evicted. She obtained new housing in Chillicothe 18 days before the final hearing date. However, due to an electrical problem, she stayed with an aunt in Greenfield for about two weeks, and the new housing only became appropriate for the child two days before the final hearing

date.  Mother testified that she was not employed and did not have a valid driver's license but planned to work on getting driving privileges.  Mother acknowledged her prior drug use but testified that she was in treatment at the Chillicothe Treatment Center, was taking prescription methadone, and had been sober for about seven months.  Mother admitted that she has four other minor children who are not in her custody but testified that she and the child were "pretty close" even though he was upset with her because of her arrest and that the child should be with her.  Mother claimed she had no knowledge of the videos of the child driving.  She did admit that there were inappropriate pictures of her on the child's phone because her email account was synced to the phone.

{¶11} The trial court granted the permanent custody motion.  The court found that Mother and the child loved each other and were bonded but that the child did not have a relationship with his four siblings, who had been removed from Mother's custody or care.  The court found that the child had a "strong bond" with his foster mother and that according to the guardian ad litem, the child wanted to stay with her.  In addition, the court found that Mother failed to complete all portions of her case plan; specifically, she did not maintain sobriety or stable housing.  The court noted that she had been "in and out" of facilities, was "recently evicted" from a residence, had moved to an "unknown location" in Greenfield, and had "just recently moved" to another location she testified had become "a suitable residence just less than a week ago."  The court found that Mother sought drug treatment with at least seven providers and "relapsed several times" while the case was pending.  She tested positive for illegal drugs after the child was returned to her custody and failed to substantiate her testimony about her current

participation in a methadone program. The court also found that before the complaint was filed, the child had not been enrolled in school and "was at least two years behind educationally." The court found that he "is now enrolled in school and is doing very well[.]" The court noted Mother's arrest during unsupervised time with the child, the videos of the child driving and testimony identifying Mother's voice on the videos, and Mother's admission that there were pictures of her on the child's phone "in various stages of undress." The court found that the child needed permanency that could not be achieved without a grant of permanent custody to the Agency and that it was in the child's best interest to grant the Agency's motion.

## II. ASSIGNMENT OF ERROR

{¶12} Mother presents one assignment of error: "THE TRIAL COURT ERRED IN FINDING THAT PERMANENT CUSTODY WAS IN THE BEST INTEREST OF THE MINOR CHILD."

## III. LAW AND ANALYSIS

{¶13} In her sole assignment of error, Mother contends that the trial court's determination that a grant of permanent custody to the Agency was in the best interest of the child was against the manifest weight of the evidence. Mother asserts that in evaluating the interactions and interrelationships of the child with others, the trial court erred in balancing her "lifelong relationship" with the child against his "new authority figure relationship" with his foster mother. Mother also asserts that the trial court erred when it found that the child's need for permanency could not be achieved without a grant of permanent custody to the Agency. Mother maintains that the evidence showed that she "made significant improvements" since the Agency filed its complaint. She

attended parenting classes, started a drug treatment program, made efforts to stay in contact with the Agency, and had unsupervised 12-hour visits with the child. Mother notes that "just two months prior to filing for permanent custody," the Agency moved the court to return custody to her based on completion of the case plan. Mother asserts that she "[c]learly * * * was capable of providing secure placement" or the court would not have granted the motion. Mother maintains that even though her "efforts were not always perfect," it is in the best interest of the child to give her "more time to complete her case plan."

**{¶14}** We have previously explained:

> A reviewing court will not reverse a trial court's judgment in a permanent custody case unless it is against the manifest weight of the evidence. *See In re T.J.,* 4th Dist. Highland Nos. 15CA15 and 15CA16, 2016-Ohio-163, ¶ 25. "To determine whether a permanent custody decision is against the manifest weight of the evidence, an appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving evidentiary conflicts, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Id.* at ¶ 25, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20. In reviewing evidence under this standard, we defer to the trial court's determinations of matters of credibility, which are crucial in these cases, where demeanor and attitude are not reflected well by the written record. *Eastley* at ¶ 21; *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).

> In a permanent custody case the dispositive issue on appeal is "whether the * * * court's findings * * * were supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 43; R.C. 2151.414(B)(1). "Clear and convincing evidence" is "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *State ex rel. Pietrangelo v. Avon Lake*, 149 Ohio St.3d 273, 2016-Ohio-5725, 74 N.E.3d 419, ¶ 14. "[I]f the children services agency presented competent

and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *In re R.M.*, 2013-Ohio-3588, 997 N.E.2d 169, ¶ 55 (4th Dist.).

*In re C.S.*, 4th Dist. Pike No. 19CA899, 2019-Ohio-5109, ¶ 21-22.

**{¶15}** R.C. 2151.414(B)(1)(d) provides that a court may grant permanent custody to a children services agency if it determines at a hearing pursuant to R.C. 2151.414(A), by clear and convincing evidence, that "[t]he child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period" and "that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody."

**{¶16}** Mother does not dispute that the Agency satisfied the time requirement but challenges the best interest determination. R.C. 2151.414(D)(1) states:

> In determining the best interest of a child * * * the court shall consider all relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

No one factor has "greater weight or heightened significance." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57. "Instead, the trial court considers the totality of the circumstances when making its best interest determination." *In re Z.M.*, 4th Dist. Scioto No. 18CA3856, 2019-Ohio-2564, ¶ 24.

### A. Interactions and Interrelationships of the Child

**{¶17}** The record contains evidence that the child is bonded with and loves Mother even though he has been upset with her because of the arrest. There is no evidence the child has a relationship with his four siblings, who are not in Mother's custody. Although Mother suggests that it was error for the trial court to balance her relationship with the child against Walker's shorter relationship with him, R.C. 2151.414(D)(1)(a) required that the court consider the child's relationship with his foster caregiver, and there is evidence to support the court's finding that the child is bonded with Walker, who has provided him with the stability that Mother has not provided.

### B. Wishes of the Child

**{¶18}** The child's wish, as expressed through his guardian ad litem, is to remain in his foster home.

### C. Custodial History

**{¶19}** The child was in Mother's custody prior to August 2017. Since then, he has been in the temporary custody of the Agency with the exception of the period from June 7, 2019, to July 16, 2019, when he was returned to Mother with court-ordered protective services. Therefore, at the time of the permanent custody hearing, the child had been in the temporary custody of the Agency for twelve or more months of a consecutive twenty-two-month period.

D.  Legally Secure Permanent Placement

**{¶20}** We have generally interpreted the phrase "legally secure permanent placement" to "mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 56.  "A legally secure permanent placement is more than a house with four walls.  Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs."  *Id.*

**{¶21}** The evidence supports a finding that the child's need for a legally secure permanent placement cannot be achieved without a grant of permanent custody to the Agency.  Mother has not maintained stable housing, stable employment, or sobriety during these proceedings.  Although Mother emphasizes her success in regaining custody in June 2019, that success was short-lived due to her substance abuse problem.  Mother also emphasizes that she has had unsupervised, 12-hour visits with the child, but her visitation was curtailed following her arrest while with the child and the discovery of videos of the child driving, evidently with her approval.  There are no suitable relative placements for the child.  However, there is evidence that he has done well in foster care, excelling in school despite being behind in his education, and there is evidence that he is bonded with his foster mother, who is willing to adopt him if the Agency has permanent custody.  The trial court could have determined that giving the child the permanency and stability that he needs, rather than continuing to hold him in custodial limbo while Mother attempts to remain drug-free and comply with other portions of her case plan would better serve the best interest of the child.  "[T]he permanent custody statutes do not contemplate leaving children in custodial limbo for

an extended period of time while a parent attempts to establish that the parent can provide the child with a legally secure permanent placement." *In re Z.M.*, 4th Dist. Scioto No. 18CA3856, 2019-Ohio-2564, ¶ 34. "[K]eeping children in limbo is not in their best interests." *Id.*, citing *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 20.

### E.  Factors in R.C. 2151.414(E)(7) to (E)(11)

**{¶22}**  The trial court did not find that any of the factors in R.C. 2151.414(E)(7) to (E)(11) applied.

### F.  Totality of the Circumstances

**{¶23}**  Based on the foregoing, we conclude that the decision to grant the Agency permanent custody was not against the manifest weight of the evidence.  The Agency presented competent and credible evidence upon which the trial court reasonably could have formed a firm belief that a grant of permanent custody to the Agency was in the best interest of the child.  We overrule the sole assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED and that Appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court, Juvenile Division to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Abele, J.:  Concur in Judgment and Opinion.

For the Court

BY:  _____
Michael D. Hess, Judge

## **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**