[Cite as *In re J.B.*, 2022-Ohio-1529.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
JACKSON COUNTY

| | | |
|---|---|---|
| In the Matter of: | : | Case No. 21CA12 |
| J.B., | : | <u>DECISION AND</u><br><u>JUDGMENT ENTRY</u> |
| Adjudicated Dependent Child. | : | |
| | | **RELEASED 5/04/2022** |

_____

<u>APPEARANCES</u>:

Autumn D. Adams, Adams Legal, LLC, Toledo, Ohio, for appellant.

Justin Lovett, Jackson County Prosecuting Attorney, and William L. Archer, Jr., Special Assistant Jackson County Prosecutor, Jackson, Ohio, for appellee.

_____

Hess, J.

{¶1}    B.B. ("Mother"), the mother of J.B., appeals from a judgment of the Jackson County Court of Common Pleas, Juvenile Division granting permanent custody of J.B. to Jackson County Job & Family Services (the "Agency"). In her first assignment of error, Mother contends the juvenile court committed plain error when it denied a motion to intervene filed by J.B.'s paternal grandmother. Even if Mother had appellate standing to make this argument, and even if the juvenile court committed an obvious error, Mother has not shown that it affected her substantial rights, i.e., that there is a reasonable probability that the error affected the outcome of the permanent custody hearing and thus resulted in prejudice. Therefore, she has not demonstrated plain error, and we overrule the first assignment of error.

{¶2}    In her second assignment of error, Mother contends the permanent custody decision was against the manifest weight of the evidence. However, after weighing the evidence and all reasonable inferences and considering the credibility of the witnesses

after according the requisite deference to the juvenile court's determinations, we conclude that the court did not clearly lose its way or create a manifest miscarriage of justice. Therefore, we reject Mother's argument and affirm the juvenile court's judgment.

## I. FACTS AND PROCEDURAL HISTORY

**{¶3}** On July 23, 2019, the Agency filed a complaint alleging that J.B., d.o.b. 10/21/18, was a neglected and dependent child. The complaint stated that the Agency received information that Mother went to jail and left J.B. with his maternal grandmother, who was allegedly using methamphetamine. The complaint identified F.S., Jr., as the child's putative father. The Agency sought a disposition of temporary custody.

**{¶4}** On August 22, 2019, the juvenile court conducted a pretrial at which Mother appeared but F.S., Jr., who had not yet been served, did not appear. Mother agreed to a voluntary safety plan with the Agency for the placement of J.B. On October 4, 2019, the court conducted an adjudicatory hearing at which Mother and F.S., Jr., appeared; however, F.S., Jr., left before the hearing. Mother stipulated J.B. was a dependent child and agreed to a disposition of temporary custody to the Agency, which would place the child with J.C.[1] The court instructed those who appeared at the adjudicatory hearing that they did not have to appear at the October 11, 2019 dispositional hearing but gave F.S., Jr., a chance to do so. He did not appear. On October 16, 2019, the court issued an entry adjudicating J.B. a dependent child and awarding temporary custody to the Agency. On October 30, 2019, the court issued an entry adopting its adjudicatory orders as dispositional orders.

---

[1] At the adjudicatory hearing, no one explained what, if any, relationship J.C. had to J.B. However, F.S., Jr., was later determined not to be J.B.'s father, and another man, C.H., was found to be the father. J.C. is C.H's mother. Thus, she is the paternal grandmother of J.B.

{¶5} On January 23, 2020, the court conducted a review hearing at which F.S., Jr., appeared but Mother did not because she was in jail. In an order related to the hearing, the court noted that another possible father had been named and ordered F.S., Jr., to submit to genetic testing. The court also noted J.B. was still in the Agency's custody, placed with J.C., and "doing well" in his placement. However, on January 30, 2020, the Agency gave notice that on the day of the review hearing, it moved J.B. to foster care. Subsequently, genetic testing revealed a 0% probability that F.S., Jr., was the child's biological father, and the court dismissed him as a party. The court added the other possible father, C.H., J.C.'s son, as a party, and ordered him to submit to genetic testing. On July 10, 2020, the Agency filed a DNA test report indicating a 99.999997% probability of paternity, and the court later found C.H. was J.B.'s biological father.

{¶6} On September 22, 2020, Mother moved the court to let J.C., then known to be J.B.'s paternal grandmother, intervene. The juvenile court summarily denied the motion. On March 10, 2021, a handwritten letter J.C. wrote to the court was filed, which stated, among other things, that she "would like to intervene."

{¶7} On March 17, 2021, the Agency moved for permanent custody, and on May 5, 2021, the court conducted a hearing on the motion. C.H. did not appear but Mother did. Mother's attorney observed that it appeared J.C. filed a motion to intervene on March 10, 2021, that there was a "previous motion" filed on Mother's behalf by her former attorney, and that "[t]here may have been a ruling on that" but not on the March 10, 2021 motion. Mother's attorney stated that it was her "understanding that the paternal grandmother would like to have legal custody of this child at this time, which would be in the best interests of my client." The judge explained that he had seen "the prior request"

and "denial from [his] predecessor of that request" and that he had "no intention of entertaining the new motion" and "issuing a ruling on that" because the issue had "already been ruled on previously."

{¶8}   Kristin Butts, social services supervisor at the Agency, testified that she initially acted as a supervisor in this matter but has been the ongoing caseworker since February 2020.  Butts testified that Mother was incarcerated from around May 2019 to late June or July 2019 and left J.B. in the care of his maternal grandmother, T.B., who used drugs.  Butts testified that the Agency has had temporary custody of J.B. since October 4, 2019.  The Agency initially placed him with J.C. but moved him to a foster home on January 23, 2020, because C.H. was residing at J.C.'s home "on and off," "insisted" her residence was his residence, and "would not provide another residence." The Agency also had concerns about drug activity happening around the home "through" C.H.

{¶9}   According to Butts, Mother's case plan required that she complete a drug and alcohol assessment and follow treatment recommendations, submit to drug screens, complete parenting classes, maintain a residence and employment, and engage in mental health counseling.  Butts testified about Mother's failed efforts to complete substance abuse treatment and mental health counseling. Mother did not complete parenting classes.  She typically kept in contact with Butts and attended weekly supervised visits with J.B. unless she was in inpatient treatment, incarcerated, or precluded from visiting due to the COVID-19 pandemic.  Mother was incarcerated from December 5, 2019, to February 15, 2020, and for about ten days in April 2021.  Mother's interactions with J.B. had "been a lot better recently."  However, the Agency could not expand visitation due to

Mother's drug screens and lack of a valid driver's license and insurance. Mother was "employed for periods" but had been unemployed since the Agency moved for permanent custody. Mother had an apartment but lost it and moved in with T.B. about a month or two before the permanent custody hearing C.H. told Butts he did not want to have contact with J.B. or be part of the case plan.

{¶10} Butts testified that J.B. needed a legally secure permanent placement and that if the Agency received permanent custody, its goal would be to find an adoptive family for him. Butts testified that J.B. appeared to be bonded to his foster family. His foster parents and a backup caregiver were interested in adopting. The Agency had explored relative placements as an alternative to a grant of permanent custody. Butts testified that T.B. was not an option due to a felony conviction. Mother often expressed that she wanted J.B. to return to J.C.'s home. However, Butts testified that J.C. was not an option because C.H.'s address of record was still J.C.'s address, and J.B. "cannot be placed where he is" under the Agency's placement criteria. Butts also indicated that the Agency had concerns about activity that occurred in J.C.'s home during C.H.'s youth. Butts admitted that she never went to J.C.'s home after J.B. was removed from there. However, she spoke to C.H. about his living arrangements in 2020, right after his paternity was established, and C.H. said, "I stay with this girl or that girl or with [J.C.] depending on if the girl I'm with will let me stay." And since then, each month, Butts made unsuccessful efforts to follow up with C.H., who had a warrant out for his arrest at the time of the permanent custody hearing. About a month or two before the permanent custody hearing, Mother suggested placement with J.B.'s great aunt, D.M., who previously had Mother's sister in her care. Butts testified that D.M. never contacted her about wanting

such a placement and that once the Agency moves for permanent custody, it "typically" does not "go backwards and look for placement with another relative." However, if the Agency receives permanent custody, it considers whether there is an appropriate relative to adopt the child.

{¶11} Laura Rippeth, a social service worker at the Agency, testified that she supervised some visits between Mother and J.B. At a March 8, 2021 visit, Mother had scabs and sores on her face and agreed to do a drug a screen. Rippeth asked Mother if it would be positive since all of her screens since August 2020 had been positive. Mother thought "it would be clean" but admitted to using methamphetamine the week before. The drug screen was positive. Rippeth testified that she observed sores on Mother's face at other visits and recalled another visit when Mother admitted to using drugs the week before.

{¶12} J.B.'s foster mother testified that J.B. was placed in her home on January 23, 2020, and was still there. She and J.B. have a good bond, J.B. gets along well with her husband, and J.B. loves her daughter. She takes J.B. to doctor's appointments, and he is in speech therapy. The foster mother did not know who J.B.'s father was and never had contact with him. She facilitated virtual and supervised in-person visits between Mother and J.B. and recalled her missing only one in-person visit but being late to almost every visit.

{¶13} Attorney Sirena Robinson testified that she had been J.B.'s guardian ad litem since July 2019 and recommended that the Agency have permanent custody. Robinson testified that there were concerns about Mother's drug use, that she failed to complete substance abuse treatment multiple times, and that she had been incarcerated

three times.  Her lack of independent housing and employment were also issues.  Robinson testified that during a recent visit between Mother and J.B., Mother was "appropriate" with the child, brought him gifts, and engaged with him.  However, J.B. did "not demonstrate much of a bond with" her.  He "would not engage in terms of saying goodbye," seemed "unbothered when she left," and "ran straight to the foster mother."  Robinson had problems maintaining contact with Mother and made multiple, unsuccessful attempts to contact C.H.  Robinson testified that she thought J.B. lived with J.C. under a safety plan for "two to three months" before the court granted the Agency temporary custody.  Robinson never visited J.C.'s home when J.B. lived there.

{¶14}  Mother's only witness was J.C., who testified that J.B. resided with her two different times.  J.C. could not recall exactly when, but thought he most recently resided with her via placement through the Agency from the end of 2019 until early 2020.  At the time, J.C. knew C.H. might be J.B.'s father.  According to J.C., the reasons the Agency gave for removing J.B. from her home were that it believed C.H. was living with her contrary to Agency instructions and that Mother and C.H. had "too much access" to J.B.  J.C. admitted the Agency had told her that C.H. could not live with her but denied that he was.  J.C. testified that C.H. got out of prison for receiving stolen property around October or November 2019 and was staying with a boyfriend of one of her daughters.  He came to J.C.'s home to visit another child of his, B.[2], who lived with her.  J.C. testified that the Agency had given permission for her to let C.H. visit B.  She let Mother visit J.B. "about every day" and let T.B. visit him, but the Agency had never prohibited this.  J.C. testified that she never let Mother, C.H., or T.B. leave the home with J.B.

---

[2] During the permanent custody hearing, this child was referred to only by first name.

{¶15} J.C. testified that she wanted legal custody of J.B. She tried to visit J.B. after his removal from her home, but the Agency would not allow visits due to the COVID-19 pandemic. She has been employed at the same business for 21 years and has no criminal history. She lives in a five-bedroom home with her two daughters and B., who J.C. now has custody of via "a private case." J.C. testified that she is separated from her husband, C.C., that he has not resided with her for about a year, but that he spends the night "[m]aybe once or twice a week." J.C. admitted that C.C. has a criminal history. She thought he was convicted of domestic violence in 2005. Over ten years ago he was convicted of receiving stolen property and went to prison. He was released "way more than five years" ago. She was not aware of him having any drug-related convictions and thought his most recent criminal proceeding involved a driving under suspension charge. J.C. thought C.C. was on probation. She indicated that she would be comfortable telling C.C. that he could not be in her home if it meant J.B. could be placed there.

{¶16} J.C. testified that C.H. does not live with her because she does not "approve of what he's doing right now." It had been "probably eight months" since he spent the night in her home. He was "probably on probation," and she thought he was living in "a tent somewhere." J.C. knew C.H. used her address as his own and claimed she spoke to him about changing it many times, but he refused to do so. J.C. testified that she does not see C.H. "that much" but admitted that she keeps her doors unlocked when she is home and that C.H. "comes and goes in and out" of her home "if he's around the neighborhood." J.C. testified that if she got legal custody, she would be willing to take every action necessary to ensure C.H. would not be in her home with J.B.

{¶17} The Agency recalled Butts in rebuttal, and she testified C.C. was convicted of a felony in 2010 and had convictions for multiple misdemeanor offenses: disorderly conduct in 2015, criminal trespassing in 2016, and possession of illegal substances in 2017 and 2019. Butts testified that none of these convictions precluded placement of J.B. in a home with C.C. However, they concerned the Agency.

{¶18} On November 1, 2021, the Agency filed a suggestion of death and attached an obituary and news article indicating C.H. had died on September 3, 2021. On November 19, 2021, the juvenile court granted the Agency permanent custody of J.B. The court found that J.B. had been in the Agency's temporary custody for 12 or more months of a consecutive 22-month period, i.e., from October 16, 2019 (the day the court issued the adjudication entry), until March 17, 2021 (the day the Agency moved for permanent custody). The court found a grant of permanent custody to the Agency was in J.B.'s best interest. The court considered J.B.'s interactions and interrelationships, stating:

> The child herein is two years old and has been separated from his mother since October 16, 2019. Since that time, Mother has consistently visited with the child in-person once weekly and also made sporadic virtual contact in between in-person visits. The in-person visits were, at times, interrupted due to Mother's incarceration. The child has had virtually no contact with his Father. Testimony bore a positive relationship between Mother and child during the limited in-person visits. However, due to Mother's consistent positive drug screens and lack of cooperation with Case Plan goals, the Court has limited information to consider when analyzing this factor as it relates to Mother.
>
> The child herein is excelling in his current foster placement, has developed a strong bond with all members of his foster family, and is receiving appropriate medical care.

The court found J.B. was unable to convey his wishes due to his tender age. The court also considered J.B.'s custodial history, finding that he had spent "the majority of his life

out of the care of his Mother," had "resided with maternal grandmother, paternal grandmother, and a foster family," and had "been in the temporary custody of a public children services agency for more than twelve months of a consecutive twenty-two month period." The court found J.B. needed a legally secure permanent placement which could not be achieved without a grant of permanent custody to the Agency. The court found "[n]o suitable relative or kinship provider was produced to the Court as an alternative to permanent custody," and specifically "relied on the fact that both proposed alternative placement households contain convicted felons and that the testimony of paternal grandmother, [J.C.], was not credible." In addition, the court addressed the factors in R.C. 2151.414(E)(7) to (E)(11).

## II. ASSIGNMENTS OF ERROR

{¶19} Mother presents two assignment of error[3]:

I.    The Trial Court erred in summarily denying to hear J.C.'s motion to intervene in the permanent custody action, as the Trial Court was required to look at the least restrictive placement when considering a legally secure and long term placement for J.B.

II.   The Trial Court's decision to grant permanent custody to the Agency rather than to J.B.'s family member was against the manifest weight of the evidence.

## III. MOTION TO INTERVENE

{¶20} In her first assignment of error, Mother contends that the juvenile court erred by "summarily denying to hear J.C.'s motion to intervene" because the court had to consider the "least restrictive placement" for J.B. Mother asserts that she has standing to appeal this ruling because it "injuriously affected" her rights. Mother claims J.C. has a

---

[3] The assignments of error are taken from pages 3 and 5 of Mother's appellate brief. They were phrased differently in the table of contents on page ii of the brief.

right to intervene under Civ.R. 24(A) because she "stood in loco parentis" to J.B., and "[t]he evidence clearly showed J.C. exercised significant parental control over, or assumed parental duties for the benefit of J.B."  Mother maintains that "[t]he outcome of the case could have been different" if the juvenile court had allowed J.C. to intervene because she "would have been able to present her own witnesses, present her own evidence and cross-examine the witnesses."  Mother asks us to reverse the juvenile court's denial of J.C.'s motion and the permanent custody order and to remand to the juvenile court "to allow J.C. to present her arguments for why she should be permitted to intervene."

**{¶21}** Generally, we review a trial court's decision on a motion to intervene for an abuse of discretion.  *State ex rel. Merrill v. Ohio Dept. of Natural Resources*, 130 Ohio St.3d 30, 2011-Ohio-4612, 955 N.E.2d 935, ¶ 41.  However, "[i]t is a general rule that an appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court."  *State v. Childs*, 14 Ohio St.2d 56, 236 N.E.2d 545 (1968), paragraph three of the syllabus.  " 'Thus, a party forfeits, and may not raise on appeal, any error that arises during trial court proceedings if that party fails to bring the error to the court's attention, by objection or otherwise, at a time when the trial court could avoid or correct the error.' "  *In re Adoption of B.L.F.*, 4th Dist. Athens No. 20CA11, 2021-Ohio-1926, ¶ 25, quoting *Cline v. Rogers Farm Ents., LLC*, 2017-Ohio-1379, 87 N.E.3d 637, ¶ 47 (4th Dist.).

**{¶22}** "Appellate courts may, however, consider a forfeited argument using a plain-error analysis."  *Id.* at ¶ 27.  The party asserting plain error must show that the court

made an obvious error that affected substantial rights, i.e., that it affected the outcome of the trial. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. The party must "demonstrate a reasonable probability that the error resulted in prejudice." (Emphasis deleted.) *Id.* Even if the party makes this showing, "in recognizing plain error in a civil case, a court must proceed with utmost caution, limiting use of the doctrine to 'the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself.' " *Jones v. Cleveland Clinic Found.*, 161 Ohio St.3d 337, 2020-Ohio-3780, 163 N.E.3d 501, ¶ 24, quoting *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 679 N.E.2d 1099 (1997), syllabus.

{¶23} In this case, Mother filed a motion asking the court to allow J.C. to intervene in this matter, which the juvenile court denied. On appeal, Mother challenges the juvenile court's ruling on J.C.'s motion to intervene, not Mother's own motion. Mother acknowledges that she did not object when the court effectively denied J.C.'s motion at the permanent custody hearing and concedes that plain error review therefore applies to her first assignment of error.

{¶24} Even if Mother had appellate standing to challenge the denial of J.C.'s motion to intervene and that ruling was an obvious error, Mother has not shown that it affected her substantial rights. J.C. testified at the permanent custody hearing, the juvenile court was aware of her desire for legal custody, and the court considered whether she was a suitable relative to care for J.B. as an alternative to a grant of permanent custody to the Agency. The court found she was not because her household contained

"convicted felons" and her testimony "was not credible." Mother merely speculates that the outcome of the case "could have been different" if J.C. had been able to call witnesses, present evidence, and cross-examine witnesses. Mother does not indicate what witnesses and evidence J.C. would have presented or articulate why Mother's own counsel could not have called the witnesses or presented the evidence. In addition, Mother had her own counsel to cross-examine witnesses, and Mother has not asserted, let alone demonstrated, that her counsel provided ineffective assistance in this regard. Thus, Mother has not shown a reasonable probability that the juvenile court's alleged error in denying J.C.'s motion to intervene affected the outcome of the permanent custody hearing and thus resulted in prejudice. Therefore, Mother has not demonstrated that the juvenile court committed plain error when it denied J.C.'s motion, and we overrule the first assignment of error.

## IV.  PERMANENT CUSTODY DECISION

{¶25}  In her second assignment of error, Mother contends that the juvenile court's decision to grant permanent custody to the Agency was against the manifest weight of the evidence. Mother asserts that J.B. has a "significant relationship" with J.C. According to Mother, their love and bond is demonstrated by the fact that J.C. has been involved in J.B.'s life "at least since he was almost a year old," that J.C. cared for him at least six months, that J.C. tried to stay involved in the case after J.B.'s removal from her home, and that J.C. came to the permanent custody hearing and testified that she wanted legal custody of J.B.

{¶26}  Mother maintains J.B.'s need for a legally secure permanent placement can be achieved without a grant of permanent custody to the Agency. According to Mother,

"J.C. is the best option for a safe, stable, consistent environment where J.B.'s needs will be met—because she has already demonstrated that she can provide all of these for J.B." Mother emphasizes the fact that J.C. has a large enough home to accommodate J.B., that J.C. has "a full-time, long-term job that can financially support" him, that he did well when placed in her home, and that there were no reports of safety concerns in her home. Mother claims the Agency was "derelict" in its "duty of care to J.B." and unfairly opposed a grant of legal custody to J.C. based on an "unverified statement" C.H. made about his living arrangements which was "almost a year old," J.C.'s inability to "stop a grown man with clear drug issues from using her address as a permanent mailing address," concerns about activity in the home "decades ago" during C.H.'s youth, and J.C. occasionally allowing her husband to stay in the home. Mother notes that J.C. denied that C.H. resided in her home and that he "passed away 2.5 months before the Trial Court used [him] as an excuse to justify denying J.B.'s right to be with his family." Mother asserts that the Agency had no issue with C.C. being in J.C.'s home when J.B. was placed with her and that there is no evidence the Agency told her she had to choose been C.C. and J.B. Mother claims that J.C. and D.M. are viable candidates for legal custody because they each had legal custody of another child and therefore are likely able to pass background checks and meet financial requirements to care for J.B. Mother asserts that Butts "openly admitted" that the Agency did not look into D.M. as a possible placement but "found the time to talk with J.B.'s foster family about adopting him."

{¶27} "A reviewing court will not reverse a trial court's judgment in a permanent custody case unless it is against the manifest weight of the evidence." *In re C.S.*, 4th Dist. Pike No. 19CA899, 2019-Ohio-5109, ¶ 21. We have explained:

"To determine whether a permanent custody decision is against the manifest weight of the evidence, an appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving evidentiary conflicts, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." [*In re T.J.*, 4th Dist. Highland Nos. 15CA15 & 15CA16, 2016-Ohio-163,] ¶ 25, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20. In reviewing evidence under this standard, we defer to the trial court's determinations of matters of credibility, which are crucial in these cases, where demeanor and attitude are not reflected well by the written record. *Eastley* at ¶ 21; *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).

In a permanent custody case the dispositive issue on appeal is "whether the * * * court's findings * * * were supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 43; R.C. 2151.414(B)(1). "Clear and convincing evidence" is "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *State ex rel. Pietrangelo v. Avon Lake*, 149 Ohio St.3d 273, 2016-Ohio-5725, 74 N.E.3d 419, ¶ 14. "[I]f the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *In re R.M.*, 2013-Ohio-3588, 997 N.E.2d 169, ¶ 55 (4th Dist.).

(First alteration and ellipsis added.) *Id.* at ¶ 21-22.

**{¶28}** R.C. 2151.414(B)(1)(d) allows a court to grant permanent custody to a public children services agency if it determines by clear and convincing evidence that "[t]he child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *" and that permanent custody is in the best interest of the child. The time between the filing of the permanent custody motion and the permanent custody hearing does not count

toward the 12-month period. *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 26. Here, there is no dispute that the time requirement was satisfied.

{¶29} R.C. 2151.414(D)(1) governs the best interest determination and provides:

In determining the best interest of a child * * * the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

No one factor has "greater weight or heightened significance." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57. "Instead, the trial court considers the totality of the circumstances when making its best interest determination." *In re Z.M.*, 4th Dist. Scioto No. 18CA3856, 2019-Ohio-2564, ¶ 24.

A. Interactions and Interrelationships of the Child

{¶30} There is evidence Mother had positive interactions with J.B. during visits, which she consistently attended when not in treatment, incarcerated, or precluded due to the COVID-19 pandemic, but she frequently arrived late. There is evidence J.B. does not have much of a relationship with C.H., who did not want to participate in this matter. J.B.

presumably had a bond with J.C. during the months he lived with her.  Although J.C. made efforts to maintain the relationship after the Agency moved him to foster care, they were inhibited due to Agency visitation policies related to the COVID-19 pandemic.  There is evidence that J.B. is doing well in foster care and has a good bond with his foster family, who he had lived with over 15 months at the time of the permanent custody hearing.

### B.  Wishes of the Child

**{¶31}**  J.B. was unable to convey his wishes due to his age.

### C.  Custodial History

**{¶32}**  As the juvenile court found, J.B. spent the majority of his life out of Mother's care.  Mother left him in T.B.'s care for an unknown amount of time in mid-2019 when Mother was incarcerated.  It is unclear exactly when he began to live with J.C., but it seems to have occurred, at the latest, on August 22, 2019, when Mother voluntarily agreed to a safety plan with the Agency.  The Agency got temporary custody on October 16, 2019, and J.B. had been in the Agency's temporary custody for more than 12 months of a consecutive 22-month period when it moved for permanent custody on March 17, 2021.  While in the Agency's temporary custody, J.B. resided with J.C. from October 16, 2019 to January 23, 2020, when the Agency placed him with the foster family.

### D.  Legally Secure Permanent Placement

**{¶33}** The Ohio Revised Code does not define the phrase "legally secure permanent placement"; however, "this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 56.  "A legally secure permanent placement is more than a house with four walls.  Rather, it generally

encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *Id.*

**{¶34}** The evidence adduced at the permanent custody hearing supports the juvenile court's finding that J.B. needs a legally secure permanent placement which cannot be achieved without a grant of permanent custody to the Agency. C.H. expressed no interest in and made no efforts toward providing J.B. with such a placement. Mother does not assert that she can provide such a placement, and the evidence demonstrates she is unable to do so. Mother has a substance abuse problem, has been incarcerated three times, and failed to make any meaningful progress on her case plan.

**{¶35}** The juvenile court did not have to determine by clear and convincing evidence that termination of Mother's parental rights was the only option or "that no suitable relative was available for placement." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 64. However, in this case, the court found that no suitable relative placement had been produced as an alternative to permanent custody, and there is evidence to support its finding. There is no dispute T.B. is not suitable because she is a convicted felon. Although Mother claims great aunt, D.M., is suitable and criticizes the Agency for not exploring a placement with her, Mother did not suggest D.M. to Butts until a month or two before the permanent custody hearing, and D.M. never contacted Butts about wanting J.B. to be placed with her.

**{¶36}** In addition, the juvenile court was free to find that J.C. was not credible and that her household contained "convicted felons." "The trier of fact 'is free to believe all, part or none of the testimony of any witness[.]' " *State v. Walker*, 4th Dist. Ross No. 21CA3737, 2021-Ohio-4489, ¶ 24, quoting *State v. Dillard*, 4th Dist. Meigs No. 13CA9,

2014-Ohio-4974, ¶ 28.  J.C.'s estranged husband, C.C., has misdemeanor and felony convictions.  J.C. admitted that she was aware of some of his criminal history, that she thought he was on probation, and that he spent one or two nights a week at her house. In addition, C.H. is a convicted felon and had an active warrant out for his arrest at the time of the permanent custody hearing.  Right after C.H.'s paternity was established, C.H. made statements to Butts indicating that he lived at J.C.'s home whenever he did not have a female companion who was willing to host him.  There is evidence that C.H. used J.C.'s address as his address and never provided the Agency with a different address despite Butts' monthly efforts to contact him and J.C.'s requests that he give a different address.  Although J.C. denied that C.H. resided with her and claimed that he had not spent the night at her home for probably eight months, the juvenile court was free to not believe this testimony.  The juvenile court also had no obligation to believe J.C.'s testimony indicating a willingness to ban C.C. and C.H. from her home.

{¶37} It is true that the Agency filed a suggestion of C.H.'s death before the juvenile court ruled on the permanent custody motion.  However, because his purported death occurred after the permanent custody hearing, no evidence was adduced at the hearing with respect to it.  Moreover, the article and obituary on which the suggestion of death is based are hearsay.  In any event, while there seems to be no dispute that C.H. died after the permanent custody hearing, his death does not automatically make J.C. a suitable relative to care for J.B.  It does not change the fact that J.C. gave testimony the juvenile court found to be incredible and that she displayed questionable judgment by sharing her home with convicted criminals.

**{¶38}** There is evidence that if the Agency has permanent custody, it will seek an adoptive family for J.B. It will consider whether any relatives are a viable option for adoption, and it has information that J.B.'s foster parents and backup caregiver are interested in adopting J.B. Thus, a grant of permanent custody to the Agency will allow J.B. to attain a legally secure permanent placement.

### E. Factors in R.C. 2151.414(E)(7) to (E)(11)

**{¶39}** The juvenile court found that the factors in R.C. 2151.414(E)(7), (E)(8), (E)(10), and (E)(11) did not apply but made findings with respect to R.C. 2151.414(E)(9). That subsection applies if

> [t]he parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

R.C. 2151.414(E)(9). The court found that Mother refused to participate in treatment two or more times after a case plan issued pursuant to R.C. 2151.412 requiring treatment was journalized as part of a dispositional order issued with respect to J.B.

### F. Totality of the Circumstances

**{¶40}** Based on the foregoing, we conclude the juvenile court's best interest finding was not against the manifest weight of the evidence. The Agency presented competent and credible evidence upon which the court reasonably could have formed a firm belief that a grant of permanent custody to the Agency was in the best interest of J.B. Because the juvenile court properly granted the Agency permanent custody of J.B. under R.C. 2151.414(B)(1)(d), we overrule the second assignment of error.

## V.  CONCLUSION

{¶41} Having overruled the assignments of error, we affirm the juvenile court's judgment.

JUDGMENT AFFIRMED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Jackson County Common Pleas Court, Juvenile Division to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
     Michael D. Hess, Judge


### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**