[Cite as *In re V.C.*, 2024-Ohio-5153.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ATHENS COUNTY

| | | | |
|---|---|---|---|
| In re   V.C. | : | Case No.   24CA8 | |
| A.C. | | | |
| J.C. | : | <u>DECISION AND</u> <u>JUDGMENT ENTRY</u> | |
| | : | | |
| | : | **RELEASED 10/23/2024** | |
| Adjudicated Abused and Dependent | | | |
| Children. | : | | |

_____

<u>APPEARANCES</u>:

Christopher Bazeley, Cincinnati, Ohio, for appellant.

Brittany E. Leach, Athens County Assistant Prosecutor, Athens, Ohio, for appellee.

_____

Hess, J.

**{¶1}**   The father[1] of V.C., A.C., and J.C. appeals a judgment of the Athens County Court of Common Pleas, Juvenile Division, granting permanent custody of the children to Athens County Children Services (the "Agency"). Father asserts three assignments of error contending that the juvenile court: (1) failed to make required statutory findings that the children were dependent; (2) failed to make required statutory findings when it terminated father's parental rights; and (3) the permanent custody award is not supported by the weight of the evidence.  We find that the father's first assignment of error is barred by res judicata because he did not appeal the juvenile court's adjudication order finding the children dependent. We find that the juvenile court made factual findings to support its decision to terminate the father's parental rights. Last, we find that the grant of

---

[1] The mother is deceased.

permanent custody to the Agency is not against the manifest weight of the evidence. We overrule the assignments of error and affirm the juvenile court's judgment.

## I.  FACTS AND PROCEDURAL HISTORY

{¶2}   On December 15, 2023, the Agency filed complaints alleging that the children appeared to be abused, neglected, and dependent children and requested it be granted permanent custody. The Agency alleged that the children had been previously placed in the emergency custody of the Agency but that the children could not be adjudicated within the 90-day statutory deadline, and the cases were dismissed. The complaint alleged that in August 2023 father engaged in a physical altercation with his girlfriend while in the car with all three children.  Several weeks later one of the children, A.C., arrived at school with a bloody nose and bruising on his arm. About a week later, father posted a video on social media of himself "dabbing" marijuana in front of the children.[2]  The juvenile court awarded the Agency emergency custody and set the matter for an adjudication on January 9, 2024.

### A. Abuse, Neglect, and Dependency Hearing

{¶3}   At the January 9, 2024 adjudicatory hearing, the Agency presented the testimony of the father who testified that his children had been in the temporary custody of the Agency on at least three different occasions. He testified that the most recent incident involving the Agency occurred when A.C. tripped and fell and hit his nose. Father testified he did not realize A.C. had a bloody nose until he got to school. Father also testified that there was another incident in which he was driving with the children and his

---

[2] "Dabbing" refers to the inhalation of highly concentrated forms of THC oil and other extracts from the cannabis plant. U.S. Centers for Disease Control and Prevention, *Cannabis and Public Health,* https://www.cdc.gov/cannabis/about/index.html?CDC_AAref_Val=https://www.cdc.gov/marijuana/faqs/how-is-marijuana-used.html (accessed Sept. 4, 2024).

girlfriend to a grocery store. He purchased each of his sons a $1.00 piece of candy. After they left the store, father testified that the girlfriend started yelling at him, "[S]he's [sic] screams about me spending $3.00 for the kids. They are screaming and yelling. I told her to shut up they're my kids. So, we get on the 691 and all of a sudden, she grabs the steering wheel and we are heading for a tree. So, my instinct was do we crash or do I, what do I do. My kids were screaming. She got punched simple as that. It's either me or my kids and it ain't going to be us. . . . She tried to wreck us into a tree." Father testified that after he punched his girlfriend, law enforcement became involved:

Q. Okay, what, so did law enforcement show up at the scene?

A. Oh, yeah. A few of em.

Q. Okay. What happened then?

A. I told them where they could shove it.

Q. You told law enforcement . . .

A. Yes, I sure did, cause they got mouthy with me.

A. Okay . . .

Q. They didn't think I knew my rights.

A. Did . . .

Q. Cause I wasn't in the wrong.

**{¶4}** Father also testified that his girlfriend had been physically abusive to J.C. in the past. The Agency introduced a video exhibit and father admitted that the video was of him dabbing "concentrated weed" in the house while his three children were present. Father explained, "What concentrated means it's smokeless. It doesn't leave that woo, and the air in your house doesn't smell like marijuana for 3 or 4 hours, and it's safer to

use. So, yes. And you have no business, this video shouldn't matter because I have a medical marijuana card."

{¶5}   Erin Shultz testified that she is an elementary school intervention specialist and is familiar with V.C., A.C., and J.C. She testified that she has access to their school records and reviewed them before testifying. She testified that she gets A.C. off the bus, walks him to breakfast, and then helps him get checked-in to homeroom. She works with A.C. because he has an autism diagnosis, and his adaptive behavior is in the low range. She testified that when A.C. got upset he would recite things "like choking, I'm dying, put him in the corner, don't call the cops . . . It's burning my eyes. . . he would become really distraught." "[I]t was like one event would trigger this backlog of other things." Shultz also testified that A.C. would often wear the same ill-fitted, soiled clothes to school. Shultz testified that one day in September she went to get him off the bus and he had dried blood all over his shirt, all over his face, down his neck, chest, hands, and arms and A.C. was very distressed. However, on cross-examination, Shultz conceded that A.C. could become so hyper-focused on things that he likes, such as credit cards, that he could have them in his face and could walk down the hallway and into a wall. It was "to the point of being dangerous."  She agreed that A.C. could slip and fall in that state. Shultz testified that all three children "ate ravenously" at school and A.C. would eat two breakfast trays a day, snacks, all his lunch, and then want a second lunch.

{¶6}   Sara Bush testified that she was the bus driver who drove V.C., A.C., and J.C. to school daily. Bush testified that she kept snacks on the bus and all three children ate the snacks to the point where she was concerned that they were not getting enough to eat. Bush recalled the day that A.C. got on the bus with blood on his shirt and his nose

and mouth were bloody. V.C. told her that A.C. fell that morning. Bush testified that A.C. kept saying it hurt and she examined him and he had a cut inside his lip that was bleeding as well as a nose bleed. Bush also testified that one of the parents of a kid on the bus sent her a video that showed father dabbing. She also had a couple of incidents with father, "they had pulled the footage off of my bus because he had got on the bus and concerned parents called in because their kids went home and said that there was a guy on the bus cussing."

{¶7} Kent Felts testified that he is an employee with the Agency and served as the school outreach caseworker for the school district that V.C., A.C., and J.C., attended. Felts testified that he had been involved with the family for a number of years, "trying to help them get as many resources and things so that the kids can be successful when they get to school." Over the years he has helped them with food, clothing, utilities, and counseling services. Felts was also familiar with father's girlfriend and the domestic violence issues over the years. Felts testified that he was concerned at times about father's ability to parent because father makes choices like continuing in a relationship with the girlfriend that is unsafe for his children. "I do think that he does his best to try to address the children's needs. I just don't know that he's able to see what those are." Felts was aware of the incident involving the violence between father and the girlfriend in the car. The father told Felts that there was tension because the girlfriend's family did not give them money. On the drive away, the girlfriend called V.C. "a fucking pedophile" and J.C. defended him and she told J.C. "to shut the fuck up." At some point it escalated to the girlfriend grabbing the car wheel and turning it and the car veered towards a tree. Father told Felts that when the car veered, "I punched that bitch in the face." Father told

Felts that she let go of the wheel, opened the door, and jumped out of the moving car. After law enforcement arrived, the girlfriend took the car, which had the family's food card in it so Felts brought a food box out to the father and his family. Felts testified that when there is an open case involving the Agency and the father, Felts does not have a lot of contact with father unless father contacts him, "when there's a caseworker that becomes involved I take a step back." As a result, Felts testified that he had not had a lot of contact with father the remainder of the school year.

{¶8}   Richard Maskiell testified that he was the assistant principal at the elementary school that V.C., A.C., and J.C. attended. Maskiell testified that he had concerns about father's ability to care for the children because they would exhibit poor hygiene, ill-fitted clothing, and a general uneasiness. However, when the children were in foster care, they would not exhibit those issues. Maskiell contacted father by telephone the day that A.C. showed up with a bloody shirt and nose and the father told him that he was asleep when the kids left for school that morning. Father asked Maskiell if the boys had said what had happened and he told father the children said A.C. had tripped and fell into a wall. Father told Maskiell that the back hallway was filled with toys and that it could very easily have happened there. Maskiell was concerned about a time when father seemed "a little out of it" and father told the school secretary he had prescription THC gummies and had "taken way too many that day." Maskiell was concerned because father seemed "on that day to be really out of it and kind of confused, and that was concerning as far as taking care of the children."

{¶9}   Elizabeth Griffith testified that she is an assessment intake worker at the Agency and is familiar with the Agency's file on the family. Griffith testified that upon

learning of the domestic fight in the car between father and his girlfriend, she spoke to father who told her that he was doing what he needed to do to protect his kids so "he punched that 'B' in the face." Father told Griffith that he was going to separate from the girlfriend, but Griffith did not believe that had happened and it caused her concern because there was a history of domestic violence between father and girlfriend and between girlfriend and the children. Griffith also investigated the incident involving A.C.'s bloody nose, and both father and V.C. informed her that A.C. had tripped into something and bloodied his nose while on his way to catch the bus that morning. She saw some bruising on A.C.'s arm but it did not look concerning to her. Griffith also testified about the video father uploaded to social media, which she described as father teaching people how to dab marijuana. Griffith testified that she spoke to father about the video and explained, "the concern wasn't the marijuana. The concern was the torch, the boiling water, asking [V.C.] to go get his lighter, asking [V.C.] to turn the oven on and participating in this in the room while the children were there."

{¶10} The juvenile court adjudicated the children as abused and dependent but did not find clear and convincing evidence that the children were neglected. The juvenile court continued the Agency's emergency custody pending a disposition hearing.

{¶11} A case plan was established with the goal of reunification of the children with their father. Under the case plan, father was to become emotionally and mentally healthy for engagement in parenting activities; demonstrate willingness and ability to meet the children's basic needs and special needs; arrange for responsible childcare in his absence; and restrain from using corporal punishment, threats, or other unreasonable discipline techniques. The plan identified that the main concern was the family's

"extensive history of involvement with the Agency" and the father's "pervasive, chronic unresolved mental health difficulties" and the children's "rather complex, developmental needs."

### B. Permanent Custody Hearing

{¶12} On February 26, 2024, the juvenile court conducted the permanent custody hearing. The guardian ad litem filed a final report prior to the hearing in which she recommended that permanent custody be granted to the Agency. In her report, she observed that father had not been able "to complete case plan activities to a level that would make it safe for the children to return to him." She also reported that while visitation had started at the "supervised" level and progressed to "monitored," father had recently engaged in frequent, angry yelling at the children and staff such that the visitation was returned to a "supervised" level. In summary, she found that the family had "a very long and extensive history with Children Services both in Athens County and other counties." She reported that all the children were doing well in their placements. She noted that A.C. has nonverbal autism and that both A.C. and J.C. are developmentally delayed and that father is unable to provide an environment and services that these children need.

{¶13} The Agency moved to have the evidence and testimony from the adjudication hearing incorporated into the disposition hearing and called three witnesses. Lane Pearce testified that she is a family support worker for the Agency and oversees visits between children and their parents that come into the Agency. She performed seven monitored visits between father and his children, who visited once a week. Pearce testified that father's visits were monitored, which meant he was monitored remotely via cameras, but his visits were changed to supervised, meaning that there is a staff member

present in the visitation room with the family. The change in the visitation status occurred because father and V.C. had a disagreement and father was yelling at V.C. and "had gotten in his face to point [sic] where staff had to intervene to break it up." However, the father did not put his hands on V.C. during the argument. Pearce testified that the dispute erupted because father was upset that V.C. was watching YouTube unsupervised at his maternal grandmother's home where he was staying. Pearce testified that father has been very polite to the Agency staff most of the time, "but there have been times where his behavior can be very aggressive towards staff." Pearce explained that father will raise his voice and get close to them and they will have to backup. Pearce testified that there is always a sheriff deputy present for all of the families who participate in visitation, the deputy's presence is unrelated specifically to father, and that the deputy has never had to get involved to calm father down. Pearce testified that father attends visitation regularly but has missed a total of six visits in the past three months. He cancelled primarily due to illness or transportation issues, but the Agency helped with transportation and father was receiving gas vouchers and now receives cab transportation to and from visits.

{¶14} M.C. testified that she is the maternal grandmother of the children. M.C. testified that she had conversations with father in October 2023 in which father would talk about how "stoned" he would get, but that he would also cook for the children. However, M.C. testified that it eventually came down to Ramen Noodle Soup that V.C. would prepare for the family and that V.C. would get his other two brothers ready for school in the morning and get their clothes ready.  M.C. testified that she has concerns that father is not able to care for the children and that he had told her at one point that he wanted M.C. to take V.C. and care for him. M.C. has not had any problems with V.C. since he

was placed in her home. V.C. is an A student and M.C. testified that she would like V.C. to continue living with her. M.C. has her son and his fiancé living with her and they help with V.C. because M.C. no longer has a driver's license. Her son and his fiancé drive V.C. to appointments and the store. M.C. assists with visitations between V.C. and his siblings every Tuesday evening, which V.C. enjoys and M.C. plans to continue. M.C. is unable to have V.C.'s other siblings placed in her home because she does not have the ability to deal with their special needs.

{¶15}  Rebecca Inboden, a caseworker with the Agency, testified that the children were ages 11, 8 or 9, and 7 at the time of the hearing and had been in the temporary custody of the Agency on at least three occasions. Inboden testified that the Agency was seeking permanent custody this time because it "has no assurance that these children will be . . . protected or provided for on a consistent basis by their biological father . . . that's evidenced by the agency having to repeatedly [be] involved with this family . . . due to various allegations of neglect or abuse." Inboden testified that two of the children are on the autism spectrum and are linked with developmental disability services, which makes them more vulnerable if exposed to a neglectful caregiver. A.C. is nonverbal and J.C. is a little more verbal than A.C. Inboden testified that over 60 referrals have been received by children services agencies regarding this family since June 2014 and of those, 8 have been substantiated or indicated for abuse and neglect. In discussing the Agency's attempts to assist father, Inboden testified:

> During prior ongoing cases multiple referrals were made for mental health services, parent mentor services, parenting classes, um, the agency has provided transportation to services and or fuel vouchers to get to and from any services in the community. We also held monthly team meetings through the Family and Children First Council. During a prior ongoing case there was constant casework counseling and consultation happening during

announced and unannounced home visits. Some random drug screens were offered for [father]. The agency provided financial assistance in the form of food vouchers or the agency would arrange food boxes when it was requested.

When asked about father's emotional and mental health, Inboden explained:

. . . [father] has demonstrated some volatility in terms of his mood and his emotional functioning. He's demonstrated the volatility not only with agency staff but with his own children, specifically [V.C.], and that has occurred in front of the agency staff. [Father] has called myself, called me, and called to complain about the children's behavior and things that the children are doing that he does not appreciate. He appears to be requesting that I parent the children on his behalf or I intervene in some way, or intercede with the children because of their behavior being unacceptable, and um, there have been occasions where I've had to hang up the phone with [father] because he cannot be verbally redirected in any way to, um, thoughtfully engage in conversation regarding whatever it is he's calling about at the time.

{¶16} Inboden testified that A.C. and J.C. are placed together in a therapeutic foster home in southeastern Ohio and appear to be thriving and have cultivated a positive relationship with their foster mother. A.C. has started talking in full sentences for the first time. V.C. is thriving in his grandmother's home and indicated that he would like to remain there on a permanent basis. Inboden testified that the Agency will take all steps possible to ensure that the siblings continue to have contact with one another, but if A.C. and J.C. are adopted by a separate foster family, it will be up to those parents to allow future contact between the siblings.

{¶17} The juvenile court called the guardian ad litem, Tara Huffman, to testify. Huffman testified that it is her recommendation that the Agency be granted permanent custody. Huffman acknowledged that father loves his children and they love him, but the children are "pretty high needs children" and she was concerned with the historical reports and the number of prior interactions with children protective services. Huffman was also concerned that the children had been adjudicated abused, neglected, or dependent on at

least three separate occasions. Huffman also expressed concerns about the safety of the children, particularly A.C., who has more severe autism issues.  Huffman said that J.C. expressed that he would like to live with father, but A.C. was unable to respond to her question about his preference. V.C. told Huffman he wanted to remain at his grandmother's home but wanted to continue to visit his siblings and his father.

## C.  Permanent Custody Decision

**{¶18}**  Following the February 2024 disposition hearing, the juvenile court issued a decision in March 2024 granting the Agency permanent custody of the children. The juvenile court reviewed the history and found:

> Although ACCS filed a Complaint for Permanent Custody on December 15, 2023, agency involvement started well before that date. ACCS has had significant involvement with these children over the years. In total, the agency has had over sixty (60) referrals regarding this family. Previously, the children have been placed into the temporary custody of ACCS and have been returned home after significant work between ACCS and the Father. Unfortunately, the children were placed back into the emergency custody of ACCS on September 15, 2023. . . . However, an adjudicatory hearing could not occur within the statutory time frame. The children were again placed in the emergency custody of the agency on December 14, 2023. The agency filed its Complaint for permanent custody of the minor children on December 15, 2023.

**{¶19}**  The juvenile court analyzed the best interest factors under R.C. 2151.414(D)(1)(a)-(e). It found that while father and the children have bonded and love one another, father's relationship with his children is strained and argumentative, and father also relies on V.C. to "parent" the other children rather than allowing V.C. to be a child himself. The court found that father's reliance on V.C. to be another parent "is inappropriate and not functional in the family relationship." The court found that all the children have positive, thriving, and safe relationships with their foster or kinship placements. The court reviewed the children's wishes and found that J.C. wanted to

return to live with his father, but V.C. wanted to continue to live with his grandmother and A.C. was unable to express his wishes. The court found that the guardian ad litem recommended the Agency be granted permanent custody of the children. The court also found that, while "[t]his is not a '12 out of 22' case,"[3] the children have been in and out of the Agency's custody repeatedly over the past two years. The court found that the children need a secure and permanent placement which cannot be achieved unless the Agency is granted permanent custody. "These children are in need of a high-level of care and Father cannot maintain the level that is needed for these children."

{¶20} The court also addressed the factors outlined in R.C. 2151.414(E)(1) and (16) as the basis for its determination that the children cannot be placed with father within a reasonable period of time or should not be placed with father. As to factor (E)(1), the court found:

> Unfortunately, this family has had significant agency involvement for several years. There have been over sixty (60) referrals to the agency, with at least eight (8) substantiated for abuse/neglect. The agency involvement stems mostly from Father's inability to keep the children safe. Additionally, it appears that Father does not understand or appreciate the significance of protecting his children from dangerous situations. The children are high-need which requires a higher level of care and support. Father does not respond appropriately to this higher level of care that is needed and, at times, become[s] volatile to others.
>
> The agency has worked with Father with his behaviors, but often, Father cannot be redirect[ed] and has not benefitted from the services provided. Particularly, Father does not understand the prior need for removal of the children and the barriers that still exist.
>
> It is important to realize that the children have grown outside the care of the Father. They are developing educationally, mentally, and physically. If the

---

[3] This refers to R.C. 2151.414(B)(1)(d), which provides, in part, for a grant of permanent custody to the Agency when "[t]he child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . . ."

children were to be returned to Father, there is a high risk that the children would revert back to where they were while in Father's care. The conditions that were present in the household at the time of removal still exist today.

**{¶21}** The juvenile court also made findings related to factor (E)(16) (any other factors):

The Court does believe that Father loves his children and that the family, as [a] whole, has been through a lot. With that said, the historical involvement of the family with the agency is important to realize it is highly likely that the children would be subjected to abuse or neglect in the future. The best measure of what is likely to happen in the future is to focus on the past. Father has continued to put the children in risky situations without realizing that he is doing so. He has not benefitted from services to educate him on such dangers. Father has failed to acknowledge that his behaviors and relationships have caused agency involvement. Father ultimately has failed to adapt to necessary changes for his children.

**{¶22}** The juvenile court found that the children cannot be placed with father within a reasonable time and should not be placed with father, that it is in the best interest of the children to be placed in the permanent custody of the Agency, and that the Agency made reasonable efforts to prevent the removal of the children from their home, to eliminate the continued removal of the children from their home, or to make it possible for the children to return safely home.

## II.  ASSIGNMENTS OF ERROR

**{¶23}** Father presents the following three assignments of error:

The trial court failed to make the requisite statutory findings to find that the children are dependent.

The trial court failed to make any of the statutorily required findings under R.C. 2151.414(B)(1) when it terminated [father's] parental rights.

The trial court's decision granting State's motion for permanent custody and terminated [sic] [father's] parental rights is not supported by the weight of the evidence.

## III.  LAW AND ANALYSIS

### A.  Standard of Review

{¶23}     "A reviewing court will not reverse a trial court's judgment in a

permanent custody case unless it is against the manifest weight of the evidence."  *In*

*re C.S.*, 2019-Ohio-5109, ¶ 21 (4th Dist.).  We have explained:

> "To determine whether a permanent custody decision is against the
> manifest weight of the evidence, an appellate court must weigh the
> evidence and all reasonable inferences, consider the credibility of the
> witnesses, and determine whether in resolving evidentiary conflicts, the trial
> court clearly lost its way and created such a manifest miscarriage of justice
> that the judgment must be reversed and a new trial ordered."  [*In re T.J.*,
> 2016-Ohio-163, ¶ 25 (4th Dist.)], citing *Eastley v. Volkman*, 132 Ohio St.3d
> 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20.  In reviewing evidence under
> this standard, we defer to the trial court's determinations of matters of
> credibility, which are crucial in these cases, where demeanor and attitude
> are not reflected well by the written record.  *Eastley* at ¶ 21; *Davis v.*
> *Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).
>
> In a permanent custody case the dispositive issue on appeal is "whether the
> trial court's findings * * * were supported by clear and convincing evidence."
> *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 43; R.C.
> 2151.414(B)(1).   "Clear and convincing evidence" is "that measure or
> degree of proof which is more than a mere 'preponderance of the evidence,'
> but not to the extent of such certainty as is required 'beyond a reasonable
> doubt' in criminal cases and which will produce in the mind of the trier of
> facts a firm belief or conviction as to the facts sought to be established."
> *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three
> of the syllabus; *State ex rel. Pietrangelo v. Avon Lake*, 149 Ohio St.3d 273,
> 2016-Ohio-5725, 74 N.E.3d 419, ¶ 14.   "[I]f the children services agency
> presented competent and credible evidence upon which the trier of fact
> reasonably could have formed a firm belief that permanent custody is
> warranted, then the court's decision is not against the manifest weight of
> the evidence."  *In re R.M.*, 2013-Ohio-3588, 997 N.E.2d 169, ¶ 55 (4th Dist.).

(First alteration added.)  *Id.* at ¶ 21-22.

### B.  Statutory Framework

{¶24}  Under R.C. 2151.414(B)(1), a juvenile court may grant permanent custody

to a public children services agency if the court determines by clear and convincing

evidence that (1) any of the circumstances in R.C. 2151.414(B)(1)(a) through (e) apply,

and (2) it is in the best interest of the child.  In this case, the juvenile court found that R.C.

2151.414(B)(1)(a) applied, i.e., the children "cannot be placed with either of the child's

parents within a reasonable time or should not be placed with the child's parents."

{¶25}  R.C. 2151.414(D)(1) outlines considerations when determining the best

interests of the child and states:

> In determining the best interest of a child * * * the court shall consider all
> relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents,
> siblings, relatives, foster caregivers and out-of-home providers, and any
> other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the
> child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been
> in the temporary custody of one or more public children services agencies
> * * * for twelve or more months of a consecutive twenty-two-month period *
> * *;
>
> (d) The child's need for a legally secure permanent placement and whether
> that type of placement can be achieved without a grant of permanent
> custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply
> in relation to the parents and child.

### C. The Dependency Findings of R.C. 2151.28(L)

{¶26}  Father contends that the court held an adjudication hearing on January 9,

2024 where it found that the children were abused and dependent, but it failed to make

any written findings of fact and conclusions of law as required by R.C. 2151.28(L) in its

adjudication entry, which issued January 25, 2024.

**{¶27}** The juvenile court's adjudication order was a final, appealable order and father had to file any appeal of it within 30 days of the judgment entry. "An appeal of an adjudication order of abuse, dependency, or neglect and the award of temporary custody pursuant to R.C. 2151.353(A)(2) must be filed within 30 days of the judgment entry pursuant to App.R. 4(A)." *In re H.F.*, 2008-Ohio-6810, syllabus. The judgment adjudicating the children abused and dependent and awarding the Agency temporary custody of the children was entered on January 25, 2024. Pursuant to App.R. 4(A), father had 30 days from that date to file a notice of appeal challenging the judgment entry. He did not. "Res judicata bars relitigation of a matter that was raised or could have been raised on direct appeal when a final, appealable order was issued . . . ." *State v. Griffin*, 2013-Ohio-5481, ¶ 3. Therefore, we overrule his first assignment of error because it is barred by res judicata. *In re K.K.*, 2022-Ohio-3888, ¶ 58-61.

### D. Statutory Findings under R.C. 2151.414(B)(1)

**{¶28}** Father contends that the trial court did not make any of the findings under R.C. 2151.414(B)(1) when it granted permanent custody of the children to the Agency. He argues that the "closest the trial court came to making findings was its holding that 'this is not a 12 of 22 case' under R.C. 2151.414(D)(3)."

**{¶29}** Although the juvenile court did not explicitly cite R.C. 2151.414(B)(1)(a), it stated on page six of its entry that it can place the child in the permanent custody of the agency if, under R.C. 2151.414(E), the court determines "that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and . . . it is in the best interest of the child." The court then goes on to list the considerations for a court when deciding "whether a child cannot be placed with either

parent within a reasonable time or should not be placed with the parents" and specifically quotes the statutory provisions of R.C. 2151.414(E)(1) and (16) on pages seven and eight of the decision. On page 13 of the decision, the juvenile court states, "Having examined the factors outlined at R.C. 2151.414(E)(1) and (16), the Court finds by clear and convincing evidence that the child cannot be placed with either parent within a reasonable time and should not be placed with the parents." Thus, the court's grant of permanent custody was expressly based on R.C. 2151.414(B)(1)(a). The court then immediately makes specific factual findings with respect to all three children, which start on page 13 of the decision and carry over to page 14, which we have quoted in full above in our previous discussion of the court's judgment entry.

{¶30} Thus, despite father's contention that factual findings concerning R.C.2151.414(B)(1)(a) were not made, we find that the juvenile court did make them in detail on pages 13 and 14 of its decision. We overrule father's second assignment of error.

### E. Manifest Weight of the Evidence to Grant Permanent Custody to Agency and Terminate Father's Custody

{¶31} Father contends that the juvenile court erred in granting permanent custody to the Agency because its decision is against the manifest weight of the evidence. Specifically, father challenges the juvenile court's best interest of the children determination and argues that the factors set forth in R.C. 2151.414(D)(1)(a) – (d) are not supported by the evidence.

### 1. Interactions and Interrelationships of the Children

{¶32} R.C. 2151.414(D)(1)(a) requires consideration of the interactions and interrelationships of the children with their parents, caregivers, and others who may

significantly affect the children. There is competent and credible evidence to support the juvenile court's finding that the children have inappropriate interrelationships and interactions with their father and experience positive relationships with their current caregivers. Specifically, the court found that the father does not have the protective capability to keep the children safe. There was testimony from several witnesses that father continued to maintain a relationship with his girlfriend even though this led to domestic violence in front of the children and at least one incident of violence between the girlfriend and V.C. There was also testimony that father heavily relies on V.C. to perform parenting responsibilities and to provide care for his high-need siblings. There was also evidence that the children are thriving in their current placements. An Agency caseworker testified that A.C. and J.C. were placed in therapeutic foster care and that they have made exceptional progress and are receiving positive reinforcement that is allowing them to develop emotionally and intellectually. Several witnesses testified about the positive relationship and bond formed between V.C. and his caretaker, his maternal grandmother.

### 2.  Wishes of the Children

{¶33}  R.C. 2151.414(D)(1)(b) requires consideration of "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." The evidence at the hearing competently and credibly supported the juvenile court's findings on this factor. The guardian ad litem testified that V.C. wanted to continue to live with his grandmother and visit his two other siblings and his father. A.C. was unable due to his developmental disability to express his wishes. J.C., who was eight years old at the time of the hearing, wanted to return home and live

with V.C. and his father. The guardian ad litem's report and her testimony recommended permanent custody of all three children to the Agency.

### 3. Custodial History

**{¶34}** R.C. 2151.414(D)(1)(c) requires consideration of the custodial history of the child. The juvenile court found that the children had been in and out of Agency custody for the last two years and that the Agency has had significant involvement with the family. This finding is competently and credibly supported by the testimony of several Agency witnesses who testified that over 60 referrals have been received by children services agencies since June 2014 and of those, 8 have been substantiated or indicated for abuse and neglect. Another Agency witness testified that the children had been adjudicated abused, neglected, or dependent on at least three separate occasions.

### 4. Legally Secure Permanent Placement

**{¶35}** R.C. 2151.414(D)(1)(d) requires consideration of the child's need for a legally secure permanent placement. The Revised Code does not define the phrase "legally secure permanent placement," but "this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 2016-Ohio-793, ¶ 56 (4th Dist.). "A legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *Id.*

**{¶36}** Competent and credible evidence supports the juvenile court's finding that a legally secure permanent placement could not be achieved without a grant of permanent custody to the Agency. Several witnesses testified about the high level of need

of A.C. and that his need for a safe, caring environment has not been served by the father, who relies extensively on V.C. to perform basic care such as food preparation and getting A.C. dressed and ready for school in the morning. There was also testimony that the children struggled developmentally while in the care of their father and have seen improvement since their removal from father's home. V.C., who was only 11 at the time of the hearing, needs to be cared for in the manner of a child his age – not cooking and caring for his younger special-needs siblings. The maternal grandmother testified that she has the ability and is willing to care for V.C. and provide him with a suitable, stable environment. The guardian ad litem also expressed concerns about the children's placement with the father as evidenced by the long history of Agency involvement.

### 5.  Factors in R.C. 2151.414(E)(7) to (E)(11)

{¶37} The juvenile court found that R.C. 2151.414(E)(7) to (E)(11) were not applicable.  Father does not contest this.

## IV.  CONCLUSION

{¶38} The juvenile court's best interest finding is not against the manifest weight of the evidence.  The Agency presented competent and credible evidence upon which the court reasonably could have formed a firm belief that a grant of permanent custody to the Agency was in the best interest of the children. Accordingly, we conclude that the permanent custody award is not against the manifest weight of the evidence, overrule the assignments of error, and affirm the juvenile court's judgment.

JUDGMENT AFFIRMED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Athens County Court of Common Pleas, Juvenile Division, to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court



BY: _____
       Michael D. Hess, Judge




**NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**